IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HUMANA INSURANCE COMPANY, a Wisconsin Corporation, ET AL., | § § § | |
| Plaintiffs, | § § | |
| V. | § § | No. 3:16-cv-2919-B |
| TENET HEALTH SYSTEM, a Texas Corporation, | § § § | |
| Defendant. | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Humana Insurance Company, Humana Health Plan, Inc., Humana Health Plan of California, Inc., and Arcadian Health Plan, Inc. (collectively, "Humana" or "Plaintiffs")[1] and Defendant Tenet Health System ("Tenet" or "Defendant") are parties to two hospital capitation participation agreements. The parties disagree about the termination dates of these agreements and have submitted the dispute to arbitration. Pending the arbitration panel's decision, Humana seeks a preliminary injunction from this Court to maintain the status quo and stay the effect of Tenet's notice of termination.

Plaintiffs' Amended Motion for a Preliminary Injunction [Dkt. No. 14] is now before the undersigned United States magistrate judge for decision and ruling pursuant to 28 U.S.C. § 636(c). *See* Dkt. No. 55.

---

[1] The Court will, for ease of reference only, treat "Humana" as a singular noun when referring to Plaintiffs collectively as "Humana."

-1-

The Court has considered the Amended Motion for a Preliminary Injunction [Dkt. No. 14], Tenet's response [Dkt. No. 22], Plaintiffs' reply [Dkt. No. 28], Tenet's further response [Dkt. No. 43], the parties' Joint Report re Request for Hearing on Motion for Preliminary Injunction [Dkt. No. 48], the parties' post-hearing briefs [Dkt. Nos. 60 & 62], and the testimony and exhibits submitted at and in connection with the evidentiary hearing [Dkt. Nos. 59, 63, & 65], and, for the reasons that follow,[2] DENIES Plaintiffs' Amended Motion for a Preliminary Injunction [Dkt. No. 14].

## Background

I.     Evidentiary Objections to Declarations

As an initial matter, the Court notes that the parties objected to declarations filed in support of the motion for preliminary injunction, response, and reply. Humana's motion for preliminary injunction is supported by the Declarations of Aliza Arjoyan [Dkt. Nos. 6, 15, & 29] and Lucinda Ehnes [Dkt. No. 7]. Tenet asserts evidentiary objections to those declarations. *See* Dkt. Nos. 22-1 & 45 (Arjoyan); Dkt.

---

[2] The Court sets out in this Memorandum Opinion and Order its findings of fact and conclusions of law. *See* FED. R. CIV. P. 52(a)(2). Although the Court has carefully considered all of the evidence, including the testimony and exhibits submitted at the hearing, the Court has written this opinion to comply with the level of detail required in this circuit for findings of fact and conclusions of law. *See, e.g.*, *Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards). The Court has not set out its findings and conclusions in punctilious detail, slavishly traced the claims issue-by-issue and witness-by-witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis. It has instead written an opinion that contains findings and conclusions to provide a clear understanding of the basis for the Court's decision. *See id.*; *accord Petrello v. Nath*, 350 F. App'x 887, 890 (5th Cir. 2009).

No. 22-1 (Ehnes). Tenet's response is supported by the Declarations of Dara Lynn [Dkt. No. 22-2] and Robert Welsh [Dkt. No. 22-3], and Humana asserts evidentiary objections to Ms. Lynn's Declaration. *See* Dkt. No. 35. Humana's reply is supported by the Declaration of Jerry Adams [Dkt. No. 30], and Tenet asserts evidentiary objections to Adams' Declaration. *See* Dkt. No. 34.

All of those declarants testified at the hearing except for Ms. Ehnes and Mr. Welsh, and the Court has not based its decision on the declarations of either of them (although the Court notes that Ms. Ehnes's substantive testimony would be cumulative of Mr. Adams's hearing testimony). Because the hearing (or submitted deposition) testimony of the other declarants effectively supersedes the declarants' previously filed declarations, the Court need not rule on the evidentiary objections to the declarations. *See generally Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 334 n.17 (5th Cir. 2013) (noting that "[s]everal of our decisions have left open the possibility that the decision to deny a preliminary injunction without an evidentiary hearing (as opposed to granting it) might be entirely within the district court's discretion – even where a genuine factual dispute remains between the parties" but that "it is fundamental that, [i]f there is a factual controversy, ... oral testimony is preferable to affidavits because of the opportunity it provides to observe the demeanor of the witnesses" and that "[t]his principle is no less true where a preliminary injunction is denied than where a preliminary injunction is granted" (internal quotation marks omitted)).

II.     Factual Background[3]

Plaintiffs, who are qualified health plan providers, and Tenet were parties to a national fee-for-service ("FFS") agreement. *See* Hospital Participation Agreement, Ex. 6 (also referred to as the "National Agreement" or "master agreement"). Section 6.1 of the National Agreement provides:

> The term of this Agreement shall commence on June 21, 2013 (the "Effective Date"). The initial term of this Agreement shall end on September 30, 2016, unless sooner terminated as provided herein. Unless sooner terminated as provided herein, the Agreement shall automatically renew for subsequent one (1) year terms unless either party provides written notice of non-renewal to the other party at least ninety (90) days prior to the end of the initial term or any subsequent renewal terms.

*Id.* Two of Tenet's hospitals were covered by the National Agreement: Doctors Medical Center of Modesto, Inc. located in Stanislaus County, California ("Modesto") and Doctors Hospital of Manteca, Inc. located in San Joaquin County, California ("Manteca"; collectively with Modesto, "the Manteca and Modesto hospitals").

Starting in February 2016, Humana and Tenet began negotiations to change the payment structure for the Manteca and Modesto hospitals from a fee-for-service model to a capitated model. *See* Ex. 51 & 101. A capitated agreement is one in which the plan pays the health care provider an agreed-upon amount per enrollee per month or

---

[3] As more fully explained below, "[f]indings of fact and conclusions of law disposing of a request for a preliminary injunction are not binding at trial on the merits." *Mylett v. Jeane*, 910 F.2d 296, 299 (5th Cir. 1990); *see also Meineke Disc. Muffler v. Jaynes*, 999 F.2d 120, 122 n.3 (5th Cir. 1993) ("This argument presupposes that the court's findings and conclusions after an abbreviated hearing on a preliminary injunction are binding as the law of the case. Such an argument is incorrect.").

percentage of premium regardless of the number of times that an enrollee needs care. Under this arrangement, the health care provider assumes some of the risk. *See Doctors Medical Center of Modesto, Inc. v. Kaiser Found. Health Plan, Inc.*, 989 F. Supp. 2d 1009, 1013 (E.D. Cal. 2013) (citing 42 U.S.C. §§ 13952-21, -23 & -24); *Flew v. Hawkins*, 401 F.Supp. 2d 619, 670 (E.D. Tex. 2005). A capitated agreement includes a Division of Financial Responsibility ("DOFR") that sets the capitation rate.

Humana sought the new pay structure to reduce its financial risk in Stanislaus and San Joaquin Counties and informed Tenet that, without a capitated arrangement, Humana would exit the counties in 2017. After oral negotiations, the parties exchanged multiple drafts of proposed capitated agreements for the Manteca and Modesto hospitals. *See* Ex. 51.

On March 8, 2016, Dawn Cirri, Tenet's AVP of Managed Care for the Western Region, sent Humana's representatives the first written proposal, which was a template of a Tenet risk agreement with a DOFR. *See* Ex. 22. The section addressing the term and termination procedure left blanks for the dates.

On March 8, 2016, Aliza Arjoyan, Humana's Vice President/Network Management, replied "that Humana is unable to utilize documents other than our own template. Since we already have an agreement with Tenet [that is, the National Agreement], we already have a base to work off of for this arrangement and the only review on your end would then be the 'capitation required' attachments to that document." Ex. 8.

On March 15, 2016, Patricia Gonzalez, Humana Director, Contracting/ Network Management, emailed two draft agreements with DOFRs to Dawn Cirri and others. In her transmittal email, Ms. Gonzalez stated that the proposed capitated agreements would be separate agreements from the current national fee-for-service agreement between Humana and Tenet, that any unassigned enrollees would be paid according to the terms of the current national fee-for-service agreement, and that the capitated agreements could be terminated separately from the National Agreement. *See* Ex. 7 & 121. Ms. Gonzalez further stated that the proposed capitated agreements were based on the current national fee-for-service agreement and that she redlined the changes "to minimize review since the applicable language is already agreed upon by both parties." *Id.* Section 6.1 of the draft agreements was identical to Section 6.1 in the National Agreement and provided an effective date of June 13, 2013 and a termination date of September 30, 2016. The date in the term provision on Exhibit A (Capitation Attachment) was left blank.

On March 20, 2016, Ms. Cirri questioned the use of separate agreements instead of an amendment to the National Agreement. *See* Ex. 51 & 101. On March 21, 2016, Ms. Gonzalez responded: "I understand your concern, however, the national agreement was negotiated by a different team than us here in California and since the capitation will be specific to the CA market, I thought it best to keep a separate document that we have control of, rather than rely on our national teams. Additionally, since these agreements will be separate from the national agreement, they can also be terminated

or 'not' terminated separately from the national agreement. In order to expedite the negotiation to meet our deadline, these base agreements are identical to the national agreement with only three exceptions." *Id.* The exceptions did not include the term or termination date. *See id.*

On March 21, 2016, Ms. Cirri responded, stating that "Tenet has a national agreement with Humana and ... we cannot deviate from the national agreement." *Id.* Ms. Arjoyan then responded to Ms. Cirri that "[w]e are not in a position to have these capitated arrangements at the mercy of a national FFS negotiation when and if that occurs again ... we've taken what we think is the best approach in utilizing what has already been approved for both organizations as our base document and modified it only with respect to what is necessary for the capitated arrangement." *Id.*

Ms. Cirri then responded to Ms. Arjoyan and Ms. Gonzalez that "Tenet has a national agreement with Humana and while I have been given permission to negotiate on behalf of the region to ensure we hit the timing needs of Humana, we cannot deviate from the national agreement." *Id.*

By this time, each party took a position concerning the relationship between the proposed capitated agreements and the National Agreement that it considered a deal breaker. On March 22, 2016, Ms. Gonzalez and Ms. Arjoyan from Humana and Ms. Cirri, Dara Lynn, and Sapna Grover from Tenet participated in a telephone conversation to discuss their differing positions. Ms. Cirri testified that Tenet insisted that the capitated agreements must be aligned with or subject to the terms of the

National Agreement, regardless of whether they were in the form of separate agreements or amendments, and that, if they were not, there would be no deal. Conversely, Ms. Gonzalez testified that Humana stated it could not have the capitated agreements tied to the National Agreement and that, if they were, there would be no deal. There are no written documents in the record memorializing the telephone conference or any agreements that may have been reached. But, at the conclusion of the telephone conference, Humana and Tenet each thought the other had acquiesced to its demand.

The parties subsequently exchanged drafts of the proposed capitated agreements that continued to include language in Section 6.1 that was identical to that in Section 6.1 of the National Agreement.

On March 23, 2016, Ms. Gonzalez emailed Ms. Cirri, stating that, "[a]s we discussed yesterday, attached are amendments to the Agreement to replace the proposed agreements sent previously." *See* Ex. 61 & 102. The draft amendments reference the National Agreement "effective June 21, 2013" and list four items that are being amended. The term and termination dates in Section 6.1 were not included in the items to be amended. *See id.*

On April 3, 2016, Ms. Cirri emailed Ms. Gonzales a redlined copy of the draft capitated agreement with proposed changes. The term and termination dates stated in Section 6.1 were not included in the redline changes. *See* Ex. 113.

On April 4, 2016, Ms. Gonzalez emailed responses to Ms. Cirri's redlined draft.

The term and termination dates stated in Section 6.1 were not addressed in those responses. *See* Ex. 112.

On April 18, 2016, Ms. Gonzales emailed Ms. Cirri another redline draft of the capitated agreement. The term and termination dates in Section 6.1 are not included in the proposed redline changes. The proposed changes did include a new provision added by Humana that allowed Humana to terminate the agreement in accordance with Section 6.1 in the event of a regulation change. *See* Ex. 108 at Attachment A, ¶ 1.1(b). And Attachment A (Capitation Attachment) for the first time supplied a date for commencement of the capitation portion of the agreement: "The term of Attachment A shall commence on January 1, 2017 and shall automatically renew in accordance with Section 6.1 of this Agreement." Ex. 108; *see also* Ex. 107.

Ms. Cirri testified that, each time that she received draft capitated agreements from Humana, she reviewed the term provisions to see if they aligned with the National Agreement. She did so because, when Tenet has a national carrier, its policy is that all renewal dates must be in alignment.

Conversely, Ms. Gonzalez and Ms. Arjoyan testified that they failed to review the term and termination dates and that, as a result of their oversight, a mistake was made concerning the term and termination dates of the capitated agreements.

On May 4, 2016, Ms. Gonzalez emailed Ms. Cirri "signature ready documents for your review." Ex. 122. Section 6.1 was identical to Section 6.1 in the National Agreement and provided for an effective date of June 1, 2013 and a termination date

of September 30, 2016 on 90-days notice of non-renewal. Attachment A (Capitation Attachment) provided that "[t]he term of Attachment A shall commence on January 1, 2017 and shall automatically renew in accordance with Section 6.1 of this Agreement." *See id.*

Ms. Gonzalez testified that she was not authorized to sign the capitated agreements because she only had authority to sign contracts with local and regional payors. She forwarded the capitated agreements to Dawn Lynn for review because Ms. Lynn "owns the relationship with Humana."

During her review on May 12, 2016, Ms. Lynn contacted Ms. Gonzalez concerning the effective date of the agreements. Referring to and quoting Section 6.1, Ms. Lynn stated: "I just realized something, the termination provision reads as below. ... What is the effective date of the cap arrangement/network supposed to be, January 1, 2017, correct?" Ex. 3. She was concerned that capitated payments would not begin until January 1, 2017. Ms. Gonzales explained that the capitated agreements were subject to the National Agreement. After that explanation, Ms. Lynn forwarded the agreements to Amy Dozier for signature because Ms. Dozier had authority to execute national documents with national payors.

Amy Dozier, Tenet's Vice President, National Accounts, Managed Care, electronically signed the capitated agreements on May 12, 2016. *See* Ex. 8. Section 6.1 of the agreements signed by Ms. Dozier stated that the effective date of the agreements was June 21, 2013 and the termination date was September 30, 2016 and that

Attachment A (Capitation Attachment) commenced on January 1, 2017 and automatically renewed in accordance with Section 6.1. *See id.*

On May 16, 2016, Aliza Arjoyan, Humana Vice President, Network Management electronically signed the capitated agreements. *See* Ex. 11. Section 6.1 of those agreements stated that the effective date of the agreements as signed by Ms. Arjoyan was January 1, 2017 and the termination date was December 31, 2018 and that Attachment A (Capitation Attachment) commenced on January 1, 2017 and automatically renewed in accordance with Section 6.1. *See id.*

The parties subsequently decided to obtain "wet ink" signatures. Tenet provided a "wet ink" signature, but, ultimately, Humana did not.

On May 23, 2016, Ms. Gonzalez emailed Ms. Cirri to inform her that she had discovered an error – specifically, that one of the DOFRs included as part of Attachment A to the Modesto agreement should have been included in the Manteca agreement instead. Ms. Cirri agreed to allow Ms. Gonzalez to switch out the DOFRs. *See* Ex. 111.

At an undetermined date, Ms. Gonzalez also realized that Section 6.1 states that the commencement date of the capitated agreements is June 21, 2013 and the termination date is September 30, 2016. Without notifying or obtaining permission from Tenet, Ms. Gonzalez changed the dates to a commencement date of January 1, 2017 and a termination date of December 30, 2019, to conform them to what she believed was the intent of the parties. and switched the pages containing Section 6.1

and the signature page in the agreements. Ms. Gonzalez then forwarded the capitated agreements to Ms. Arjoyan for execution. Ms. Gonzalez did not tell Ms. Arjoyan that she had changed the language and switched out the pages.

On June 15, 2016, Tenet provided written notice of non-renewal of the National Agreement and stated that termination would be effective on September 30, 2016. The notice included the capitated agreements for Manteca and Modesto (collectively and generally referred to hereinafter as the "Capitated Agreements"). *See* Ex. 20.

On June 16, 2016, a Humana representative emailed fully executed agreements to Ms. Lynn and Ms. Cirri. The agreements were sent from California at 7:52 p.m. Ms. Lynn, who was in Louisiana, responded at 11:04 p.m., just over an hour later, to Ms. Cirri, Ms. Gonzalez, and others that "we have a problem." Ex. 13. During her review of the documents, Ms. Lynn discovered that the dates in Section 6.1 had been changed from an effective date of June 30, 2016 and a termination date of September 30, 2016 to an effective date of January 1, 2017 and a termination date of December 31, 2018. *See id.*

At 12:56 a.m. on June 17, 2016, Ms. Gonzalez emailed Ms. Cirri to seek her approval for the following language that she proposed submitting to Ms. Lynn: "You are correct, there was an <u>error</u> originally as the first documents had the same initial period as the national Agreement. However, the intent was never to have this be the initial period for these California documents. ... I discussed with Dawn and she agreed the correction needed to be made in order to accurately reflect the intent of the

negotiation." Ex. 13 & 21 (emphasis in original). Ms. Gonzalez then stated to Ms. Cirri that "[i]f you wish to change the intent to reflect the same initial period as the National Amendment, which was an error, then this contract will not be valid." *Id.*

At 3:59 a.m., Ms. Cirri responded: "No that is not correct. We discussed changing the [DOFRs]. We did not discuss the change you are referencing below." *Id.*

At 7:29 a.m., Ms. Gonzalez responded: "Agree but it is an error because the term we have been having discussing [sic] all along is the 2017 and 2018. I'm happy to take the blame for making this oversight and change but cannot agree to change it back. Do you agree that this is the intent all along." *Id.*

At 7:31 a.m., Ms. Cirri responded that "our intent has always been to include this amendment as part of the master agreement." *Id.*

The parties then began discussions concerning their positions as to the term and termination dates of the Capitated Agreements. Humana contends that the term of the Capitated Agreements was intended to be from January 1, 2017 to December 31, 2018 and argue that an incorrect termination date was included in the Capitated Agreements as the result of mutual mistake because, during the drafting process, the parties originally used the National Agreement as a template for the Capitated Agreements. According to Humana, the parties inadvertently failed to change the National Agreement's September 30, 2016 termination date in the Capitated Agreements to reflect the parties' mutual understanding and intent.

Tenet disagrees and contends that it always intended for the National

Agreement and the Capitated Agreements to be in alignment and to have the same termination dates.

To make amends for changing the dates in Section 6.1 and switching out the pages without notifying or obtaining Tenet's approval, Humana agreed to resume negotiations for capitated agreements for the Manteca and Modesto hospitals with a three-year term instead of a two-year term, as previously agreed, and with a commencement date of January 1, 2017 and a termination date of December 31, 2019, but, ultimately, an agreement was not reached. *See* Ex. 14.

At the evidentiary hearing, Jerry Adams, Humana Director of Sales with responsibility for Stanislaus and San Joaquin Counties, California, testified that the Open Enrollment period for Medicare enrollees is from October 15, 2016 to December 7, 2016. According to Mr. Adams's testimony, 1,700 eligible enrollees have signed up during the enrollment period for Humana's Medicare Advantage Plan in these two counties for 2017, and 5,000 enrollees have rolled over into the plan.

Mr. Adams "speculated" that, if the preliminary injunction is denied or the TRO is dissolved, those elderly Medicare Advantage enrollees who are currently enrolled would be confused, may need to switch to a new primary care physician or specialist, and might also need to switch medication from one formulary to another. He also speculated that Plaintiffs' reputation would be harmed and that there would be ill will between Plaintiffs and their brokers.

Mr. Adams further testified that it is typical and normal for hospitals to move

in and out of Plaintiffs' networks from year to year and that there is nothing extraordinary about an enrollee's being required to decide whether to stay or go when a hospital moves out of network.

Mr. Adams testified that the degree of harm suffered by the enrollees would depend on timing. According to his testimony, it would be "no big deal" if the enrollee learns that a hospital or doctor would be out of network for the upcoming year if the enrollee learns the information before the beginning of the enrollment period, and a customer can switch his or her enrollment from one plan to another during the enrollment period. Ms. Arjoyan also testified that, even at this stage of the enrollment process, Plaintiffs have sufficient time to inform existing and potential enrollees that the Manteca and Modesto hospitals are out of network.

Plaintiffs informed their enrollees in June and August of 2016 that the Manteca and Modesto hospitals might be and, then, were out of network. After Judge Ishii granted the TRO on October 4, 2016, Humana changed its databases to indicate that the Manteca and Modesto hospitals were in network.

III.    Procedural Background

On September 19, 2016, Humana submitted the dispute concerning the termination date of the Capitated Agreements to arbitration. *See* Dkt. No. 13 at 2 ("However, without justification, Tenet is now taking the position that it can unilaterally terminate the Capitated Agreements as of September 30, 2016, months before the Capitated Agreements are to commence. Tenet took this position only after

the parties discovered, through mutual mistake, that the Capitated Agreements they executed inadvertently contained an old provision from a prior contract that set forth a termination date of September 30, 2016 – three months prior to the inception date for the Capitated Agreements. Despite ongoing efforts to resolve this contract dispute through informal channels, the parties have been unable to reach a workable resolution."). Accordingly, pursuant to the arbitration provision in the subject contract, Humana filed a demand for Arbitration with the American Health Lawyers Association on September 19, 2016. (This demand is attached to the Amended Complaint as Exhibit A, and is wholly incorporated by reference as if fully set forth herein.) Among the remedies sought in the Demand for Arbitration is reformation of the Capitated Agreements to reflect the agreed commencement date of January 1, 2017, and the agreed termination date of December 31, 2018 and for breach of contract, insofar as Tenet refuses to adhere to these mutually agreed dates.").

Pending arbitration, on September 29, 2016, Humana filed a complaint in the United States District Court for the Eastern District of California, *see* Dkt No.1, and, in its First Amended Complaint for Injunctive Relief; Reformation; Breach of Contract (the "First Amended Complaint") [Dkt. No. 13] (the current live pleading in this matter), has asserted claims for reformation of the Capitated Agreements and breach of contract for failure to adhere to mutually agreed terms and seeking injunctive relief, *see* Dkt. Nos. 13. Humana raised the same claims in its Demand for Arbitration filed with the American Health Lawyers Association on September 19, 2016 (10 days before

the first filing in the Eastern District of California) but, in its demand, seeks only reformation, damages, and a permanent injunction. *See* Dkt. No. 13-1.

In the First Amended Complaint, Humana alleges that "[t]he outcome of the pending arbitration will not be determined until after September 30, 2016 – the date Tenet claims that the Capitated Agreements will expire"; that, "[i]f the contract dispute is not resolved or the contracts are deemed to have expired, Humana will suffer irreparable injury, loss, or damage because its relationships with health benefit plan enrollees will be disrupted and its goodwill and reputation will be harmed in a manner difficult to quantify in damages by the uncertainty stemming from whether or not Plaintiffs' Medicare Advantage Plan has a participating provider relationship with respect to the aforementioned facilities, and thus enrollees will be unsure as to which facilities should render medical care for them pursuant to the terms of Plaintiffs' Medicare Advantage health benefit plan"; and that "Plaintiffs will further suffer irreparable injury, loss, or damage to its standing with The Centers for Medicare and Medicaid Services ('CMS') because of its uncertain status as either a participating or non-participating health benefit plan for the aforementioned facilities." Dkt. No. 13 at 2-3.

According to Humana, "[t]his uncertainty impacts actual and prospective Medicare health benefit plan enrollees who will not be able to make informed choices as to competitive health benefit plans available to them for the aforementioned facilities during the Medicare Open Enrollment Period, which commences on October

15, 2016, and cannot be readily quantified in damage." *Id.*

Humana also filed an ex parte application for a temporary restraining order and motion for preliminary injunction on September 29, 2016, *see* Dkt. No. 4, and, when Senior District Judge Anthony W. Ishii denied the first application without prejudice on September 30, 2016, *see* Dkt. No. 10, Humana filed its First Amended Complaint [Dkt. No. 13] along with an amended ex parte application for a temporary restraining order and Amended Motion for a Preliminary Injunction on October 4, 2-16, *see* Dkt. No. 14.

In support of its pending request for a preliminary injunction, Humana asserts that, "[i]n light of the realities regarding the duration of arbitration proceedings, their frequent inability to address immediate concerns, and the motivation of one side to delay those proceedings, the immediate intervention of the Court is needed to preserve the status quo pending arbitration and, *ipso facto*, the meaningfulness of the arbitration process." Dkt. No. 13 at 3 (internal quotation marks omitted). Citing *Toyo Tire Holdings of Americas Inc. v. Cont'l Tire North America, Inc.*, 609 F.3d 975, 980-981, 982-83 (9th Cir., 2010), Humana contends that "[t]he fact that arbitration proceedings have already begun, or that injunctive relief was also sought in the arbitration, does not change the need for prompt judicial intervention in light of the existing and continuing harm that will occur without an immediate injunction." *Id.* Humana requests an order "to preserve the status quo by enjoining Tenet from deeming the Capitated Agreements terminated effective September 30, 2016, and from

taking any actions or making any statements to the effect that said contracts have been terminated" and explains that it "seeks the requested temporary restraining order and preliminary injunction to maintain the status quo so that the dispute may be resolved through the pending arbitration." *Id.*

In the Amended Motion for a Preliminary Injunction, Plaintiffs state that they "seek only to preserve the status quo between themselves and Defendant Tenet Health System, until the final disposition of a pending arbitration between them in which Plaintiffs claim a right to reform two Medicare Advantage hospital participation agreements to correct a drafting error caused by admitted mutual mistake." Dkt. No. 14 at 5. In its response, Humana contends that there was no mistake concerning the termination date of the Capitated Agreements and argues that only the arbitration panel can properly grant injunctive relief. *See* Dkt. No. 22.

In an Order on Plaintiffs' Amended ex Parte Application for a Temporary Restraining Order and Order Setting Briefing Schedule for Preliminary Injunction, Judge Ishii granted a temporary restraining order ("TRO") on October 4, 2016, providing that "Defendant is TEMPORARILY RESTRAINED from deeming its contracts with Plaintiffs concerning Doctors Hospital of Manteca, Inc. (dba Doctors Hospital of Manteca) and Doctors Medical Center of Modesto, Inc. (dba Doctors Medical Center of Modesto), to be terminated effective September 30, 2016, and from taking any actions or making any statements to the effect that said contracts have been terminated." Dkt. No. 18 at 6. As part of the order granting the TRO, Judge Ishii also

required that, pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs post a bond for the benefit of Tenet in the amount of $5 million. *See id.*

Judge Ishii later extended the TRO and transferred the case to the Dallas Division of the United States District Court for the Northern District of Texas, as required by the forum-selection clause of the arbitration agreement. *See* Dkt. No. 36. In that transfer order, Judge Ishii explained that, "[b]y error or otherwise, the original factual basis for the temporary restraining order is infirm" but that "Humana's reply makes additional arguments and specifies different evidence than that which was initially raised in the second ex parte application regarding a likelihood of success." Dkt. No. 36 at 10-11. Judge Ishii also noted that "Tenet makes additional arguments regarding venue and emergency relief from the arbitrator" but that, "given the Court's resolution of this case, it is unnecessary to address these arguments." *Id.* at 6 n.2.

After the case was transferred, the presiding judge over this matter, United States District Judge Jane A. Boyle, pursuant to the parties' agreement to extend the TRO, ordered that the TRO is extended for up to and including 30 days, so that the order will expire on December 1, 2016, absent further order of this Court. *See* Dkt. No. 52 at 1.

The parties then filed a Stipulated Consent of the Parties to Submit Plaintiffs' Motion for Preliminary Injunction to Magistrate Judge for Final Decision, in which they explained that, "[i]n order to expedite a ruling on the presently pending motion for a preliminary injunction, Plaintiffs, and each of them, and Defendant, by and

through their respective attorneys of record, hereby stipulate and consent, pursuant to the provisions of 28 U.S.C. § 636(c), that Plaintiffs' motion for a preliminary injunction may be heard and decided by United States Magistrate Judge David Horan, and do hereby waive their right to proceed before a Judge of the United States District Court with respect to said motion, and that Magistrate Judge David Horan may render a final and binding decision on said motion, subject to the applicable provisions of the Federal Rules of Civil Procedure, and the Federal Rules of Appellate Procedure." Dkt. No. 54 at 1.

Judge Boyle then ordered that, "pursuant to the stipulated consent of the parties that the pending motion for preliminary injunction be reassigned for decision and ruling to the United States Magistrate Judge David Horan in accordance with 28 U.S.C. § 636(c)." Dkt. No. 55 at 1.

The Court set a hearing on Humana's amended motion for preliminary injunction on November 9, 2016 after explaining that, "[a]fter consideration of the arguments made by Plaintiffs and Defendant Tenet Health System in the joint report, the Court finds that factual disputes have been presented and that the parties should be given a fair opportunity and meaningful hearing to present their differing versions of those facts before the Court" decides the motion. Dkt. No. 53 at 1.

The Court held the evidentiary hearing on the motion on November 9, 10, and 14, 2016. *See* Dkt. Nos. 56, 57 & 58.

Following the hearing, Humana asserts that "Humana seeks a preliminary

injunction: (1) which will not cause any harm to Tenet (because it will get paid on either a fee for service or capitated basis for patients referred to their hospital); (2) which will serve the public interest (by sparing 6,700 senior citizens of the inconvenience of changing Medicare Advantage plans, and the anxiety of possibly disrupting their relationships with the primary care physicians or treating specialists); (3) which will preserve the status quo of keeping Tenet in-network (as all the enrollees fully expect); and finally (4) for which Tenet is fully secured for any damages incurred by a $5 million bond." Dkt. No. 62 at 24 (emphasis removed). According to Humana, "Tenet's objections to the preliminary injunction rest on hyper technical arguments only lawyers' could love, not judges weighing whether to exercise their equitable authority," and "there is no good reason to deny injunctive relief given the evidence and authorities submitted, and accordingly Humana urges that the Court grant its motion and enjoin Tenet until the conclusion of the arbitration proceeding." *Id.*

Tenet, in turn, contends that, "[o]n the basis of a fabricated contract Tenet never signed, Humana has asked this Court to enter a mandatory injunction commanding Tenet to comply with the terms of that fabricated document," where "mandatory injunctions are 'particularly disfavored' by courts and should only be issued if the 'facts and law clearly favor' Humana," and that, "[f]or two principle reasons, they do not." Dkt. No. 60 at 1.

According to Tenet, "[f]irst, Humana simply cannot prove by 'clear and convincing evidence' that it is likely to prevail on the merits of its 'mutual mistake'

theory of liability. To the contrary, if the record evidence proves anything 'clearly and convincingly,' it is that Humana's claim fails as a matter of law." *Id.*

And, Tenet asserts, "[s]econd, Humana can show no irreparable harm. Its sponsoring witness concedes his opinions regarding irreparable harm are merely 'speculative' guesses about 'what might happen'"; "Humana's own witnesses admit that if the injunction is timely denied, even these speculative harms will be avoided"; and, "to the extent any speculative harms do materialize, Humana's inexplicable decision to wait nearly four months and until the eve of open enrollment season to seek injunctive relief will be the sole and exclusive cause of such harms." *Id.* at 2.

IV.   <u>Undisputed Matters</u>

According to the evidence before the Court in this preliminary injunction proceeding, it is undisputed that the National Agreement was terminated effective September 30, 2016 and, but for the TRO, would not be in effect as to the Manteca and Modesto hospitals.

It is undisputed that there is not a single version of the Capitated Agreements that was signed by both Humana and Tenet, where Tenet never signed a Capitated Agreement with a termination date of December 31, 2018 and Humana never signed a Capitated Agreement with a termination date of September 30, 2016.

It is undisputed that there is and has always been a gap between the September 30, 2016 termination date of the National Agreement and the January 1, 2017 commencement date for payments on a capitated basis under the Capitated

Agreements and that no agreement, by its terms, covers this "gap period."

## Legal Standards

A preliminary injunction is "an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (internal quotation marks omitted).

"To be entitled to a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 252-53 (5th Cir. 2009) (internal quotation marks omitted); *accord Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) ("The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest."); *see generally Univ. of Tex. v. Camenisch*, 451 U.S. 390, 392, 398 (1981) (approving of the district court's and the United States Court of Appeals for the Fifth Circuit's relying on the balance of the four factors enunciated in *Canal Authority*).

Or, as the United States Supreme Court has most recently put the standard, "'[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Glossip v. Gross*, 135 S. Ct. 2726, 2736 (2015) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)), *reh'g denied*, 136 S. Ct. 20 (2015).

This is a "difficult" and "stringent" standard for the movant to meet, and the movant bears "the burden of establishing each element." *Whitaker v. Livingston*, 732 F.3d 465, 469 (5th Cir. 2013); *Janvey v. Alguire*, 647 F.3d 585, 591, 595 (5th Cir. 2011). The United States Court of Appeals for the Fifth Circuit has "cautioned repeatedly that a preliminary injunction is an extraordinary remedy which should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Bluefield*, 577 F.3d at 253 (internal quotation marks omitted); *accord Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 275, 278 (5th Cir. 2012); *Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 352 (5th Cir. 2012); *S. Monorail Co. v. Robbins & Myers, Inc.*, 666 F.2d 185, 186 (5th Cir. 1982); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. Unit A Feb. 1981); *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 114 (5th Cir. 1979). "The failure of a movant to establish one of the above four elements will result in the denial of a motion for temporary injunction." *Medlin v. Palmer*, 874 F.2d 1085, 1091 (5th Cir. 1989). This has long been

the rule in this circuit. *See Canal Auth.*, 489 F.2d at 573 ("The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff."); *see also Treasure Salvors, Inc. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 640 F.2d 560, 568 (5th Cir. 1981) ("Although in order to prevail on a request for a preliminary injunction, the moving party must carry the burden on all four elements, this four step analysis is actually a tool to assist the court in answering the essential question determining the propriety of a preliminary injunction, i.e., whether the injunction is necessary to preserve the court's ability to render a meaningful decision on the merits.").

Thus, "the decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985). "A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations and internal quotation marks omitted); *see also Heil*, 542 F. App'x at 336-37 ("A preliminary injunction is to be issued only when the balance of hardships favors the party seeking the injunction. This calculation requires a court to consider the competing claims of injury and ... the effect on each party of the granting or withholding of the requested

relief. A district court therefore can only perform this task after identifying the most serious possible injury that can be claimed by either party." (footnotes and internal quotation marks omitted)).

Further, "satisfying one requirement does not necessarily affect the analysis of the other requirements." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016). "[A]n injunction is an equitable remedy that should only issue when essential to prevent an otherwise irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 221 (5th Cir. 2016); *see also id.* at 226 (explaining that "an injunction is an 'extraordinary remedy' that should not issue absent a substantial threat that the movant will suffer irreparable injury without one"); *White*, 862 F.2d at 1211 ("Without question, the irreparable harm element must be satisfied by independent proof, or no injunction may issue.").

"[T]he issuance of a prohibitory injunction freezes the status quo, and is intended 'to preserve the relative positions of the parties until a trial on the merits can be held.' Preliminary injunctions commonly favor the status quo and seek to maintain things in their initial condition so far as possible until after a full hearing permits final relief to be fashioned." *Wenner v. Tex. Lottery Comm'n*, 123 F.3d 321, 326 (5th Cir. 1997) (citation omitted; quoting *Camenisch*, 451 U.S. at 395).

Accordingly, if a plaintiff seeks "a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law." *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990); *accord Martinez v.*

*Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) ("Mandatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party."). Because "[a]n indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury, [o]nly in rare instances is the issuance of a mandatory preliminary injunction proper." *Tate v. American Tugs, Inc.*, 634 F.2d 869, 870 (5th Cir. 1981) (internal quotation marks omitted).

As Humana notes, the Fifth Circuit has also cautioned:

> It must not be thought, however, that there is any particular magic in the phrase 'status quo.' The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Canal Auth.*, 489 F.2d at 576 (citations omitted).

But, despite these words of caution, the rule in this circuit remains that, "when a plaintiff applies for a mandatory preliminary injunction, such relief 'should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.'" *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (quoting *Miami Beach Fed. Sav. & Loan Ass'n v. Callander*, 256 F.2d 410, 415 (5th Cir. 1958) ("A mandatory injunction of this nature, especially at the

preliminary stage of proceedings, should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.")). The Fifth Circuit's pronouncement of that rule predates its *Canal Authority* decision, and "[t]he rule in this circuit is that where two previous holdings or lines of precedent conflict the earlier opinion controls and is the binding precedent in this circuit (absent an intervening holding to the contrary by the Supreme Court or this court en banc)." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 n.8 (5th Cir. 2006); *accord United States v. Sanchez-Pena*, 336 F.3d 431, 444 n.62 (5th Cir. 2003) ("'When faced with conflicting panel opinions, the earlier controls our decision.'" (quoting *United States v. Miro*, 29 F.3d 194, 199 n.4 (5th Cir. 1994))).

As to the prongs of the preliminary injunction test, "[t]o show a likelihood of success, the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sci., L.L.C. v. Vascular Health Sci., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013); *see also id.* at 584-85 (explaining that a movant "need only present a prima facie case, rather than meet the standard for summary judgment, to establish a likelihood of success on the merits"); *Janvey*, 647 F.3d at 596 ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win." (internal quotation marks omitted)); *id.* at 599 ("The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed – thereby obviating the need to prove fraudulent intent of the transferees – and sufficient proof

-29-

that each individual received transfers of money from the Ponzi scheme. The Defendants did not refute this by showing that they are likely to succeed in proving a TUFTA statutory affirmative defense. Consequently, the district court did not err in finding a substantial likelihood of success." (emphasis removed)).

"The only question that the district court ha[s] to decide on this element in the preliminary injunction proceeding [is] whether the [movant has] shown a substantial likelihood of ultimately succeeding on the merits, potential procedural hurdles notwithstanding." *Janvey*, 647 F.3d at 599 (citation omitted; emphasis removed); *see also id.* ("The parties dispute whether Rule 9(b) applies to this case and whether this affects the district court's finding of a substantial likelihood of success. .... We need not and do not address the issue of whether heightened pleading is required. As the district court noted in its Preliminary Injunction Order, it has not yet ruled on the defendants' pending motions to dismiss.").

"[T]he plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987). But "[m]erely finding that there is more likelihood than 'no chance' is not sufficient to sustain the granting of a preliminary injunction." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.3 (5th Cir. 1979).

"To assess the likelihood of success on the merits, [the Court] look[s] to standards provided by the substantive law." *Janvey*, 647 F.3d at 596 (internal quotation marks omitted). If a plaintiff fails to identify an enforceable right that a

preliminary injunction might safeguard, it cannot prevail on the merits and therefore cannot show a substantial likelihood of ultimately succeeding on the merits. *See Sepulvado v. Jindal*, 729 F.3d 413, 420 (5th Cir. 2013); *Janvey*, 647 F.3d at 599. And, in a relatively recent decision, the Fifth Circuit has held that plaintiffs there "cannot show a substantial likelihood of prevailing on the merits because the law on the question at the heart of the dispute does not favor their position," such that, "even if Plaintiffs have some chance of prevailing after an adjudication on the merits, the preliminary injunction was issued in error." *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 225 (5th Cir. 2010).

According to recent Fifth Circuit case law, a preliminary injunction applicant cannot avoid showing a substantial likelihood that it will prevail on the merits. *See Sepulvado*, 729 F.3d at 420 ("Because we have determined that [Sepulvado] cannot show a substantial likelihood of success ..., we need not address [the state]'s additional arguments regarding the other necessary elements for preliminary injunctive relief. Our ruling on the initial element is sufficient for reversal. The holding on the initial element is sufficient to vacate the injunction." (citations and internal quotation marks omitted); *La Union*, 608 F.3d at 225 ("The award of preliminary injunctive relief is an extraordinary remedy that should only issue if the movant shows a substantial likelihood of prevailing on the merits.").

And, notwithstanding the related but distinct standard for obtaining a stay pending appeal, the Court has located no Fifth Circuit decision holding that a movant

seeking a preliminary injunction – as opposed to a stay pending appeal – can meet its burden by presenting only a substantial case on the merits, even where there is a serious legal question involved and the balance of the equities (or relative threatened harms) may heavily favor maintaining the status quo. *Cf. Southerland v. Thigpen*, 784 F.2d 713, 715 (5th Cir. 1986) ("In ruling on applications to this Court for stay pending appeal, we have held that where the last three *Canal Authority* factors (irreparable injury, balance of harm as between the parties, and not disserving the public interest) weigh heavily in favor of granting a stay, the first *Canal Authority* factor, likelihood of success on the merits, may be considered as requiring not a probability of success on the merits, but merely 'a substantial case on the merits.' Assuming, *arguendo* only, that this standard should be applied to our review of the district court's denial of the preliminary injunction, it does not affect the result here, as we conclude that plaintiffs have not presented a substantial case on the merits for this purpose. We likewise believe that the district court recognized as much, as it noted that '[w]hile the *Canal Authority* test has been interpreted to be flexible, it cannot be satisfied without some likelihood of success.' In essence, the district court held that plaintiffs had demonstrated no substantial case on the merits. We agree." (citations omitted)).[4]

---

[4] *See generally Veasey v. Perry*, 769 F.3d 890, 893 (5th Cir. 2014) ("[T]here is substantial overlap between [the factors governing stays pending appeal] and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." (citation and internal quotation marks omitted)); *In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013) ("The traditional four-factor test for a stay pending appeal is

But an older line of Fifth Circuit decisions holds that, "[a]s long as this [likelihood-of-success] factor is present to some degree, it is not even necessary that a substantial likelihood of success be shown" and that, "[w]here the other factors are strong, a showing of some likelihood of success on the merits will justify temporary injunctive relief." *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980). The Fifth Circuit has further explained:

> The prerequisite, as an absolute, is more negative than positive: one cannot obtain a preliminary injunction if he clearly will not prevail on the merits; however, that he is unable, in an abbreviated proceeding, to prove with certainty eventual success does not foreclose the possibility that temporary restraint may be appropriate. In its negative sense, the factor is critical; but viewed positively, the importance and nature of the requirement can vary significantly, depending upon the magnitude of the injury which would be suffered by the movant in the absence of interlocutory relief and the relative balance of the threatened hardship faced by each of the parties. This is so because, as we have noted, none of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus.

*State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975) (citation omitted).[5] And, again, "where two previous holdings or lines of precedent conflict the

---

typically used to analyze requests for a preliminary injunction. However, where there is a serious legal question involved and the balance of the equities heavily favors a stay ... the movant only needs to present a substantial case on the merits." (footnote and internal quotation marks omitted).

[5]   *See also Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 389 n.11 (5th Cir. 1984) ("Even assuming a showing by plaintiffs that they were more likely than not to prevail on the merits, the factor of balance of potential harm is virtually equal under the sliding scale analysis set out in *State of Texas v. Seatrain Int'l S/A*, 518 F.2d 175, 180 (5th Cir. 1975). While the sliding scale analysis recognizes an interdependence among the four factors, the requirement that all four factors must be considered does

earlier opinion controls and is the binding precedent in this circuit (absent an

intervening holding to the contrary by the Supreme Court or this court en banc)." *Rios*,

---

not allow the balance of harm factor to be significantly reduced on this record."); *Fla. Med.*, 601 F.2d at 203 n.2 ("We recognize that finding a 'substantial likelihood that movant will ultimately prevail on the merits' does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits. Technically, of course, the four oft-mentioned prerequisites are only the most important considerations, and the traditional formulation of the rule is in no way meant to exclude consideration of other relevant factors. Rather, the four prerequisites represent the minimal factors which must be addressed by the court before a preliminary injunction may be issued."); *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978) ("None of these factors possess a fixed quantitative value; they are applied on a case-by-case, sliding-scale basis. Where one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others."); *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307, 1309 (5th Cir. 1974) ("Plaintiffs-appellants are of course correct that a sliding scale must be applied in considering the probability of plaintiffs' winning on the merits and plaintiffs' irreparable injury in the absence of interlocutory relief."); *Canal Auth.*, 489 F.2d at 576 ("The parties have not made a major issue of the requirement that plaintiff demonstrate a substantial likelihood of prevailing on the merits, and the various court orders do not discuss the issue. However, it is important to consider this requirement, since, regardless of the balance of relative hardships threatened to the parties, the granting of a preliminary injunction would be inequitable if the plaintiff has no chance of success on the merits. The importance of this requirement varies with the relative balance of threatened hardships facing each of the parties. Although a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met. Conversely, if there is only slight evidence that plaintiff will be injured in the absence of interlocutory relief, the showing that he is likely to prevail on the merits is particularly important."); *cf. Def. Distributed*, 838 F.3d at 463 & n.5 (Jones, J., dissenting); *Green v. Wells Fargo Bank, N.A.*, 575 F. App'x 322, 324 (5th Cir. 2014) ("Wells Fargo argues that the district court abused its discretion by applying (i) a 'sliding scale' approach and (ii) a 'serious question' standard for evaluating plaintiff's likelihood of success on the merits. Although Wells Fargo's challenge to the analysis of plaintiff's likelihood of success on the merits has purchase, we need not reach this question: a recent Texas Supreme Court opinion all but forecloses Green's arguments.").

444 F.3d at 425 n.8.

But, under this same line of authority, "[n]o matter how severe and irreparable an injury one seeking a preliminary injunction may suffer in its absence, the injunction should never issue if there is no chance that the movant will eventually prevail on the merits. Nor is there need to weigh the relative hardships which a preliminary injunction or the lack of one might cause the parties unless the movant can show some likelihood of ultimate success." *State of Tex.*, 518 F.2d at 180; *accord Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) ("An absence of likelihood of success on the merits is sufficient to make the district court's grant of a preliminary injunction improvident as a matter of law." (internal quotation marks omitted)). And this line of cases still requires that a movant "clearly carr[y] the burden of persuasion," that is, "his burden of proof as to [a preliminary injunction's four] prerequisites." *Canal Auth.*, 489 F.2d at 573; *accord State of Tex.*, 518 F.2d at 179 (noting that a preliminary injunction "is an extraordinary and drastic remedy which should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of what we have recognized as the four prerequisites to such relief"). And so does, most importantly, governing Supreme Court authority. *See Winter*, 555 U.S. at 22 (explaining that preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

As to the second prong, the movant "must show that it is likely to suffer

irreparable harm, that is, harm for which there is no adequate remedy at law," and "[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant." *Daniels Health*, 710 F.3d at 585 (internal quotation marks omitted). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the United States Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Further, the "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction," and the Supreme Court has rejected a standard providing "that when a plaintiff demonstrates a strong likelihood of prevailing on the merits, a preliminary injunction may be entered based only on a 'possibility' of irreparable harm." *Id.* at 21-22 (emphasis removed); *cf. S. Monorail*, 666 F.2d at 188 ("In addition, we expressly reject Robbins & Myers' suggestion that we adopt a rule that the balance of harm factor should be presumed in the movant's favor from a demonstration of a substantial likelihood of success on the merits of an infringement claim. Such a presumption of the balance of harm factor would not comport with the discretionary and equitable nature of the preliminary injunction in general and of the balance of harm factor in particular.").

"[W]hen the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.

It is thus well-established that an injury is irreparable only if it cannot be undone through monetary remedies. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon*, 703 F.3d at 279 (citations and internal quotation marks omitted).

If the movant's "only alleged harm can be obviated by monetary relief, it does not constitute the 'irreparable' injury necessary to obtain the extraordinary relief of a preliminary injunction." *Id.* at 280 (footnote omitted). "There are a few narrow exceptions to the rule that the possibility of an award of damages precludes a finding of irreparable harm sufficient to authorize a preliminary injunction," including "where the rights are economic, but because of their nature or the circumstances of the case establishment of the dollar value of the loss is especially difficult or speculative." *Miss. Power*, 760 F.2d at 630 n.12; *see also Janvey*, 647 F.3d at 600 ("In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages. However, the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions. We have previously stated that where a district court has determined that a meaningful decision on the merits would be impossible without an injunction, the

district court may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute or its direct, traceable proceeds." (citations and internal quotation marks omitted)).

Courts in this district have also held that a movant's "delay in seeking a TRO and preliminary injunction militates against the issuance of a TRO or preliminary injunction." *Joseph Paul Corp. v. Trademark Custom Homes, Inc.*, No. 3:16-cv-1651-L, 2016 WL 4944370, at *16 (N.D. Tex. Sept. 16, 2016).

The last two prongs of the "preliminary injunction analysis implicate the discretion of [the district] court to craft a remedy and weigh the evidence." *Janvey*, 67 F.3d at 601. "The third preliminary injunction factor requires [the movant] to show that, absent an injunction, its threatened injury outweighs any harm [the party opposing injunctive relief] will suffer as a result of the injunction." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Where a movant shows that its "harm is irreparable," its opponent "would need to present powerful evidence of harm to its interests to prevent [the movant] from meeting this requirement." *Id.* But "a showing of substantial likelihood of success on the merits does not create a presumption that harm to the plaintiff outweighs harm to the defendant." *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989).

In deciding a motion for a preliminary injunction, the "court may employ informal procedures and rely on generally inadmissible evidence." *Jackson Women's*

*Health Org. v. Currier*, 760 F.3d 448, 451 (5th Cir. 2014) (internal quotation marks omitted). "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence," and "can accept evidence in the form of deposition transcripts and affidavits." *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

"A party ... is not required to prove his case in full at a preliminary-injunction hearing," *Camenisch*, 451 U.S. at 395, and a ruling on whether the movant has shown "a substantial likelihood it would prevail on the merits" does "not amount to a ruling on the merits," *Jonibach Management Trust v. Wartburg Enters., Inc.*, 750 F.3d 486, 491 (5th Cir. 2014). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held [or, in this case, until the arbitration is concluded]. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. Thus, the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits" and "may be challenged at a later stage of the proceedings." *Id.* (citations and internal quotation marks omitted); *accord Hollis v. Itawamba Cty. Loans*, 657 F.2d 746, 748 n.2 (5th Cir. Unit A Sept. 1981) ("Although evidence received at a Rule 65(a) hearing may enter the trial record, the court's findings of fact and conclusions of law

with regard to the preliminary injunction are not binding at trial. Based as they usually are, on incomplete evidence and a relatively hurried consideration of the issues, these provisional decisions should not be used outside the context in which they originally were rendered." (internal quotation marks omitted)).

## Analysis

I.    Seeking Injunctive Relief from the Court Rather than the Arbitration Panel

Prior to the Court's setting the Amended Motion for a Preliminary Injunction for an evidentiary hearing, Tenet asserted that "(1) the Capitated Agreements require all disputes to be arbitrated before the American Health Lawyers Association ("AHLA") and subject to the AHLA's rules of arbitration; (2) Humana has commenced an arbitration proceeding before the AHLA; and (3) the Capitated Agreements and AHLA arbitration rules establish that the arbitrator has the authority to rule on the arbitrability of Humana's claim for injunctive relief" and that "[g]overning Fifth Circuit law and the Federal Arbitration Act hold that Humana's request for injunctive relief be decided in arbitration, and not before this Court." Dkt. No. 48 at 2.

Without now passing on the merits of this argument, the Court notes that this is not a matter that implicates the Court's subject matter jurisdiction. "[A]greements to arbitrate implicate forum selection and claims-processing rules not subject matter jurisdiction." *Ruiz v. Donahoe*, 784 F.3d 247, 250 (5th Cir. 2015) (footnote omitted).

And, whatever may have been the merits of Tenet's position at the time that Humana was seeking a temporary restraining order, there appears to be no dispute

that, at this point in time, it would benefit no one to deny the Amended Motion for a

Preliminary Injunction without prejudice to Humana's seeking injunctive relief from

an arbitration panel – which the parties have reported has not yet been selected and

empaneled.

II.    Prohibitory or Mandatory Injunction?

As explained above, a preliminary injunction generally seeks to maintain the

status quo pending, in this case, the completion of arbitration. Because the Capitated

Agreements, on their face, provide for a term from June 21, 2013 through September

30, 2016 and for automatic renewal for one-year terms unless either party provided

written notice of non-renewal at least 90 days prior to the end of the termination date,

and because Tenet provided written notice of non-renewal of the Capitated Agreements

on June 15, 2016, Tenet asserts that Humana's requested preliminary injunction would

not preserve the status quo but rather amounts to a mandatory injunction that would

give Humana the affirmative relief that it seeks through its claims submitted for

arbitration.

The Fifth Circuit has addressed a similar argument in a manner that does not

favor Tenet's position.

In *Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192 (5th Cir.

2003), the defendant was "a national supplier of automotive repair parts which it

markets through a nationwide network of warehouse distributors"; the plaintiff "has

been a dealer in [the defendant's] automotive parts since 1977"; and "[t]he instant

controversy arose when [the defendant] purported to terminate the Parts Agreement [between the plaintiff and the defendant] by having a letter hand-delivered to [the plaintiff], notifying it that [the defendant] was terminating that contract effective 30 days after delivery." *Id.* at 193, 194. "At the time, [the plaintiff and the defendant] were operating under the most recent version of their Parts Agreement, which had been extended for an indefinite term by a letter mailed less than two months prior to the delivery of the termination notice." *Id.* at 194. The plaintiff sued, asserting that the defendant's "putative termination of the Parts Agreement pursuant to the termination provision of that contract was invalid because it contravened applicable Louisiana law," including "the termination provision of Louisiana's Repurchase of Farm, Industrial, and Lawn and Garden Equipment by Wholesaler Act ('Repurchase Act')." *Id.* at 193.

The district court determined that the defendant's "30-day, no-cause termination notice failed to satisfy the applicable 90-day, good-cause termination provision of the Repurchase Act" and that the plaintiff therefore "met the likelihood-of-success prong of the temporary injunction test," and "[a]fter addressing the three remaining prongs of that test and concluding that [the plaintiff] met them all, the district court granted the preliminary injunction that prohibits [the defendant] from terminating the Parts Agreement." *Id.* at 195.

On appeal from the preliminary injunction, the defendant invoked the rule "that a mandatory preliminary injunction that goes beyond the status quo is even more

disfavored and should not be issued unless the facts and law clearly favor the moving party." *Id.* at 196 (footnote and internal quotation marks omitted). The Fifth Circuit rejected this argument because the panel "fail[ed] to see the relevance of that proposition here, ... because the preliminary injunction granted by the district court does precisely that; it maintains the status quo by keeping in effect a contractual relationship that has existed between the parties for almost a quarter century. The court merely commanded [the defendant] to maintain the status quo by refraining from terminating the Parts Agreement." *Id.*

Humana, for its part, takes issue with Tenet's contention that Humana seeks a mandatory injunction. *See* Dkt. No. 62 at 14. According to Humana, "[a]t the threshold, Judge Ishii has already concluded, and properly so, that Humana seeks to maintain, not alter, the status quo: 'If the status quo is not maintained, the 5,000 enrollees may no longer be able to continue to receive care at the two hospitals.' (Dkt. No. 18 at 5:7-9.) The status quo which has been preserved by Judge Ishii's order is the relationship of the parties before the effective date of the notice of non-renewal." *Id.* Humana explains that, "in this action, the core dispute centers on the efficacy of Tenet's notice of non-renewal, and Humana never sought reinstatement" but rather "explicitly sought to maintain the status quo as of the date of filing, September 29, 2016." *Id.* at 15 n.13.

Humana contends that it "sought relief before the expiration of the national agreement (Dkt. No. 4 [filed 9/29/16]), and the fact that Judge Ishii did not act until

after the effective date of the termination notice was no barrier to maintaining the status quo as of the time Humana filed its application." *Id.* at 14-15. Humana asserts that, where "[t]he purpose of a preliminary injunction is to preserve the status quo, prevent irreparable injury to the parties, and preserve the court's ability to render a meaningful decision after a trial on the merits," "[i]f injunctive relief is denied here, the Court will be disabled from restoring the Tenet hospitals to in-network status, certainly during the pendency of the arbitration, if ever." *Id.* at 15.

Humana argues that "[t]he relief [it] seeks, and that which Judge Ishii ordered, is the antithesis of a mandatory injunction," where "Judge Ishii directed Tenet be restrained from deeming its contracts with Humana 'to be terminated effective September 30, 2016, and from taking any actions or making any statements to the effect that said contracts have been terminated.' (Dkt. No. 18 at 6:14-18.)" and where "[s]uch an order can hardly be understood as a command to act in an extraordinarily extensive manner." *Id.* (footnote omitted).

But Humana further contends that, where "more than 6,500 elderly Medicare Advantage enrollees will confront considerable disruption of a core aspect of their lives – the predictable provision of hospital services – if injunctive relief is denied," "[w]hether seen as prohibitory or mandatory, the 5th Circuit [decision in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974),] counsels that a court should always keep the main thing – prevention of injury – the main thing." *Id.* at 16.

But Tenet notes that "Humana concedes that the Hospital Participation Agreement expired on September 30, 2016 and that the term of the [Capitated Agreements] do not begin until January 1, 2017, leaving a three month 'gap' in which these hospitals remain out-of-network," and asserts that "Humana plainly seeks a mandatory injunction here.

> First, as Humana admits, the injunction it seeks would alter the status quo. Humana concedes that even under its urged interpretation of the [Capitated Agreements], the two Tenet hospitals at issue are presently out-of network and will remain out of network until January 1, [2017]. Humana's requested injunction – to enjoin Tenet from "deeming its contracts with [Humana] for the aforementioned facilities to be terminated" – would thus not "freeze the status quo" but unquestionably "alter" it.
> Second, Humana seeks an injunction ordering Tenet to affirmatively comply with the terms of the "reformed" [Capitated Agreements]. And according to Humana, the term of these Agreements do not begin until January 1, 2017. By seeking an order "commanding" Tenet to perform under those Agreements, Humana is seeking mandatory relief.

Dkt. No. 60 at 3-4 & n.7 (footnotes omitted and emphasis removed).

For the reasons explained below, the Court need not resolve this dispute as to the nature of the relief granted by the TRO and sought in a preliminary injunction because Humana has failed to meet its burden even under the most lenient standard for establishing a likelihood of success on the merits.

III.   Applying the Four-Prong Preliminary Injunction Test

    A.   Likelihood of success on the merits

        i.   Governing law

Because, to assess the likelihood of success on the merits, the Court must look

to standards provided by the substantive law governing the claim at issue, the Court must first determine which state's law governs Humana's claim in this case in which Humana invokes the Court's diversity jurisdiction under 28 U.S.C. § 1332(a).

In the First Amended Complaint, Humana (1) seeks reformation under California law of contracts between Humana and Tenet to reflect the parties' original mutual intent, (2) sues for a breach of contract regarding Tenet's alleged failure to adhere to mutually agreed terms, and (3) seeks an injunction to maintain the status quo until the dispute is resolved at arbitration. *See* Dkt. No. 13.

Humana "request[s] the temporary injunctive relief as follows: 1. Tenet Health is hereby temporarily enjoined from deeming its contracts with Plaintiffs for the aforementioned facilities in the affected counties to be terminated effective September 30, 2016, and from taking any actions or making any statements to the effect that said contracts have been terminated until the contract dispute has been resolved through informal negotiation among the parties or by decision in the arbitration currently pending before the American Health Lawyers Association; [and] 2. Defendant, its officers, agents, servants, employees, and attorneys are hereby ordered bound by this temporary restraining order." *Id.* at 11. Humana asserts that this "relief is narrowly tailored in that it only seeks to preserve the status quo, to prevent irreparable harm to Plaintiffs and to protect the 4,915 Medicare Advantage HMO enrollees whose healthcare will be jeopardized if Tenet is not enjoined from terminating the contract, until these issues are decided in the pending arbitration." *Id.*

And Humana has sought a preliminary injunction only on the basis of its first cause of action seeking reformation of the Capitated Agreements pursuant to California Civil Code § 3399 based on mutual mistake. *See* Dkt. No. 14; Dkt. No. 28; Dkt. No. 48.

Humana asserts that the agreements at issue "provide for the application of the law in the states where the hospitals are situated" and that "Defendant's medical facilities are located in California." Dkt. No. 14 at 7. Paragraph 12.3 of the Capitated Agreements provides for application of the law in the states where the hospitals are situated, and, as Humana notes, the Manteca and Modesto hospitals at issue are in California. *See* Dkt. No. 17-4 at 9. Tenet does not address this choice-of-law issue.

Judge Ishii transferred this action to this Court under 28 U.S.C. § 1404(a) based on a forum-selection clause in the agreements at issue. *See* Dkt. No. 36. The United States Supreme Court has recently clarified that, "when a party bound by a forum-selection clause flouts its contractual obligation and files suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules." *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 582 (2013). The Court explained that "[a] federal court sitting in diversity ordinarily must follow the choice-of-law rules of the State in which it sits" and that, although the Court "previously identified an exception to that principle for § 1404(a) transfers, requiring that the state law applicable in the original court also apply in the transferee court," "[t]he policies motivating our exception to the *Klaxon* rule for §

1404(a) transfers ... do not support an extension to cases where a defendant's motion is premised on enforcement of a valid forum-selection clause." *Id.* at 582-83. "To the contrary, those considerations lead us to reject the rule that the law of the court in which the plaintiff inappropriately filed suit should follow the case to the forum contractually selected by the parties," and the Court concluded that "when a transfer stems from enforcement of a forum-selection clause," "[t]he court in the contractually selected venue should not apply the law of the transferor venue to which the parties waived their right." *Id.* at 583.

Accordingly, the Court must apply Texas's choice-of-law rules. *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 580 (5th Cir. 2015). Under Texas law, a choice-of-law clause is generally enforceable "'unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [Restatement] § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'" *Id.* at 581 (quoting Restatement (Second) of Conflict of Laws § 187(2)).

Here, the parties had a reasonable basis for agreeing that California law would apply given that the Manteca and Modesto hospitals at issue are located in that state, and nothing in the record suggests that any other state (including Texas) has a

materially greater interest than California in the determination of the particular issues in this matter.

Accordingly, as the parties appear to agree, California law governs Humana's contract-related claims.

ii.    Reformation based on mutual mistake

In its first cause of action, Humana alleges:

22.    As evidenced by communications reflecting negotiations that resulted in the agreed-upon terms, Humana and Tenet (operating as Doctors Hospital of Manteca and Doctors Hospital of Modesto) desired to continue their business relationship under capitated agreements that would take effect on January 1, 2017 and continue for two years until December 21, 2018. The Capitated Agreements were negotiated to keep Humana in the San Joaquin County and Stanislaus County, California markets. Following the negotiations, the parties reduced their agreements to writings, which Humana prepared and transmitted to Tenet. Each of the Capitated Agreements contains an attachment, which is incorporated into the body of the respective agreements, reflecting that the term of the Capitation Attachment shall commence on January 1, 2017.

23.    Through inadvertence and in an effort to expedite the completion of the Capitated Agreements, Humana mistakenly included a provision [Section 6.1] from the prior, fee-for-service, Hospital Participation Agreement, which provided for a commencement date of June 21, 2013 and an initial termination date of September 30, 2016. Both parties have acknowledged that a commencement date of June 21, 2013, is mistaken and does not truly express the mutual and expressed intention of the parties, being inconsistent with every other term of the Capitated Agreements, which were not set to commence under the Capitated Agreements until January 1, 2017. Both parties have also acknowledged the inconsistency of a September 30, 2016 termination date in the Capitated Agreements. Tenet admittedly overlooked this mistake when Tenet executed the Capitated Agreements on May 12, 2016. Tenet admitted that the language stating a termination date of September 30, 2016, was not consistent with the mutual intent of the parties expressed as they negotiated the Capitated Agreements, and agreed to a commencement date of January 1, 2017, and a termination date of

December 31, 2018.

      24.    Tenet knew and expressly agreed that the termination date for the Capitated Agreements was December 31, 2018. The Capitated Agreements, with a termination date of December 31, 2018, expressly and correctly reflect the parties' intention in agreeing to the new Capitated Agreements. Yet, Tenet now claims the Capitated Agreements (which have an effective commencement date of January 1, 2017) can be terminated on September 30, 2016.

      25.    To the extent that Tenet takes the position that it can terminate the Capitated Agreements on September 30, 2016, Humana has been damaged by Tenet's failure to acknowledge the Capitated Agreements and, therefore, seeks reformation of the Capitated Agreements pursuant to section 3399 of the California Civil Code to express the true intention of the parties that the Agreements take effect on January 1, 2017 and continue for the agreed-upon term. Pursuant to the terms of the Capitation agreements, there is presently pending arbitration between the parties under the auspices of the American Health Lawyers Association, pursuant to the terms of the agreements between the parties. In the arbitration, Humana seeks, among other remedies, reformation of the two agreements to reflect the true, mutual intent of the parties as described above. .... As such, the Court should stay any final adjudication on the merits of the reformation pending completion of the arbitration.

Dkt. No. 13 at 7-8.

Following the hearing, Humana contends that "[t]he evidence, properly understood, demonstrates that the [Capitated Agreements] must be reformed to reflect the expressed intentions of the parties" and "clearly proves an understanding that Humana and Tenet did agree that the [Capitated Agreements] were to start in 2017 and proceed through 2018, and do so unencumbered by whatever machinations might play themselves out in other national negotiations"; that "[o]nly when progress on the national scene stalled, requiring termination of the national agreement, did Dara Lynn and Cirri cry 'foul' realizing that their understanding of the autonomy of the [Capitated

Agreements] from the national agreements inconvenienced Tenet on other fronts"; and that, "[t]hus, the [Capitated Agreements] clearly reflect a mutual mistake, from which Tenet now tries to distance itself." Dkt. No. 62 at 2-3.

Humana further asserts that, where "[i]njunctive relief is an equitable remedy," "[i]t is simply wrong to permit Tenet to string Humana's negotiators along, lulling them into a false belief that their capitation partner was reliable and sincere, when its disguised intention was to drop the termination hammer on the [Capitated Agreements] in these two counties, to attempt to pinch Humana in negotiations over the national contract," and that "[o]nly through a preliminary injunction can this irreparable harm to Medicare enrollees be avoided." *Id.* at 4.

"To determine issues of state law, [the Court] look[s] to final decisions of the state's highest court, and when there is no ruling by that court, then we have the duty to determine as best we can what the state's highest court would decide. In making an *Erie* guess ... this Court may look to the decisions of intermediate appellate state courts for guidance." *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 69 (5th Cir. 2014) (alterations, citations, and internal quotation marks omitted). In fact, "[a] federal court sitting in diversity must follow decisions of the state's intermediate appellate courts, unless convinced by persuasive data that the highest court would decide differently." *Team Envtl. Servs., Inc. v. Addison*, 2 F.3d 124, 126 n.4 (5th Cir. 1993). "There is, therefore, a working presumption that state intermediate appellate court decisions represent accurate statements of state law." *Exxon Co., U.S.A., a Div. of Exxon Corp.*

*v. Banque De Paris Et Des Pays-Bas*, 889 F.2d 674, 675 (5th Cir. 1989).

Under California law, "a contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"; "[a]lthough the intention of the parties is to be ascertained from the writing alone, if possible, [a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates"; and, "[h]owever broad may be the terms of a contract, it extends only to those things which it appears that the parties intended to contract." *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002) (citations and internal quotation marks omitted).

"When, through ... mistake ..., a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded," and, "[i]f there is a mutual mistake of the parties, a written contract may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." *Id.* (citations and internal quotation marks omitted). California Civil Code § 3399, on which Humana's reformation claim rests, provides: "When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." CAL. CIV. CODE § 3399;

*see also id.* § 3340 ("For the purpose of revising a contract, it must be presumed that all the parties thereto intended to make an equitable and conscientious agreement.").

"The purpose of reformation is to correct a written instrument in order to effectuate a common intention of both parties which was incorrectly reduced to writing." *Alderson v. Ins. Co. of N. Am.*, 223 Cal. App. 3d 397, 411 (1990) (internal quotation marks omitted). Thus, "[w]here one seeks to reform a written instrument he must establish by clear and convincing evidence that the objectionable language found in the instrument was the result of mutual mistake by the parties." *Perry v. Bedford*, 238 Cal. App. 2d 6, 11 (1965); *accord Lister v. Sorge*, 260 Cal. App. 2d 333, 338 (1968) ('The purpose of reformation is to correct a written instrument in order to effectuate a common intention of both parties which was incorrectly reduced to writing. To justify the court in changing the language of the instrument sought to be reformed, ... it must be established that both parties agreed to something different from what is expressed in the writing, and the proof upon this point should be ... clear and convincing...." (citations and internal quotation marks omitted)); *Moore v. Vandermast, Inc.*, 19 Cal. 2d 94, 98 (1941) ("In the absence of clear and convincing evidence to the contrary, a written instrument is presumed to express the true intent of the parties."). "This standard requires a 'finding of high probability' so that there is 'no substantial doubt,' a standard that is particularly difficult to satisfy where there is a written contract." *Northrop Grumman Corp. v. Factory Mut. Ins. Co.*, No. CV 05-08444 DDP PLAX, 2011 WL 4501945, at *8 (C.D. Cal. Sept. 28, 2011) (quoting *In re Angelia P.*, 28 Cal.3d 908,

919 (1981) ("Clear and convincing evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be 'so clear as to leave no substantial doubt; sufficiently strong to command the unhesitating assent of every reasonable mind." (internal quotation marks omitted))).

"A contract cannot be reformed solely because one of the parties made a mistake." *Perry*, 238 Cal. App. 2d at 11. "By mutual mistake is meant a situation where both parties share the same misconception." *Renshaw v. Happy Valley Water Co.*, 114 Cal. App. 2d 521, 524 (1952). Courts cannot "reform an instrument according to the terms in which one of the parties understood it, unless it appears that the other party also had the same understanding." *Bailard v. Marden*, 36 Cal.2d 703, 708 (1951); *see also Hedging Concepts, Inc. v. First Alliance Mortg. Co.*, 41 Cal. App. 4th 1410, 1421 (1996) (explaining that, "in the interest of preserving some reasonable stability in commercial transactions, the courts will not set aside contractual obligations, particularly where they are embodied in written contracts, merely because one of the parties claims to have been ignorant of, or to have misunderstood, the provisions of the contract" (citation omitted)).

"In reforming the written agreement, a court may transpose[ ], reject[ ], or suppl[y], but has 'no power to make new contracts for the parties." *Hess*, 27 Cal. 4th at 524 (citations and internal quotation marks omitted). "Rather, the court may only reform the writing to conform with the mutual understanding of the parties at the time

they entered into it, if such an understanding exists." *Id.*

And "a contract may be reformed due to mutual mistake based upon 'ordinary negligence,' but not when the mistake is based upon 'gross negligence.'" *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 778 (2007); *see also Hess*, 27 Cal. 4th at 528-29 ("In *Rosenthal*, the plaintiffs asked the court to find an arbitration agreement void for fraud in the execution. We held that the plaintiffs' negligence in failing to review the agreement precluded the requested relief. We, however, noted that a contracting party's negligence does not necessarily preclude equitable relief, such as reformation. Indeed, we have long held that ordinary negligence will not bar a claim of mutual mistake because [t]here is an element of carelessness in nearly every case of mistake.... Only gross negligence or preposterous or irrational conduct will preclude a finding of mutual mistake. Thus, [t]he fact that the party seeking relief has read the instrument and knows its contents does not prevent a court from finding that it was executed under a mistake. Likewise, representation by counsel does not preclude a finding of mutual mistake. Here, the contracting parties knew Hess intended to sue Ford after signing the Release, but mistakenly used a boilerplate form with overly broad language to memorialize their agreement. Under these facts, Hess is, at most, guilty of ordinary negligence and not the gross negligence necessary to preclude relief." (citations and internal quotation marks omitted)).

And, "[i]f the contract itself is void, as, for example, because it is immoral or because the parties have not agreed on all of its terms, and there is, for that reason,

no final contract or understanding between them, or, because the contract lacks consideration, reformation is impossible, since there is no valid contract to reform." *Calhoun v. Downs*, 211 Cal. 766, 769-70 (1931) (internal quotation marks omitted).

"'[I]nasmuch as the relief sought in reforming a written instrument is to make it conform to the real agreement or intention of the parties, a definite intention or agreement on which the minds of the parties had met must have pre-existed the instrument in question." *Bailard*, 36 Cal.2d at 708 (internal quotes marks omitted); *see also Gillis v. Sun Ins. Office, Ltd.*, 238 Cal. App. 2d 408, 414 (1965) ("It is also axiomatic that the court cannot reform and remake a contract for alleged mistake where there was never any such common intent."). "Reformation, on the ground of mutual mistake, presupposes actual agreement (i.e., no mistake) between the contracting parties as to what they intend, but further presupposes that all parties mistakenly believe that the written contract expresses their intention." *Treadaway v. Camellia Convalescent Hosps., Inc.*, 43 Cal. App. 3d 189, 197 (1974).

"In determining whether a mutual mistake has occurred, a court may consider parol evidence. Such evidence is admissible to show mutual mistake even if the contracting parties intended the writing to be a complete statement of their agreement. It is the rule that, where the writing itself, through mistake, does not express the intention of the parties who entered into it ... and the writing does not therefore contain the real contract between the parties, the objection as to parol evidence is without merit. Extrinsic evidence is necessary because the court must divine the true

intentions of the contracting parties and determine whether the written agreement accurately represents those intentions." *Hess*, 27 Cal. 4th at 525 (citations and internal quotation marks omitted); *see also* CAL. CIV. CODE § 3341 ("In revising a written instrument, the court may inquire what the instrument was intended to mean, and what were intended to be its legal consequences, and is not confined to the inquiry what the language of the instrument was intended to be.").

Where a party relies solely on "mutual mistake and the meaning of the relevant contractual language is not in dispute, the party alleging the mistake ... bears the burden of proving that a mistake occurred." *Hess*, 27 Cal. 4th at 525 (citations omitted). This may include providing evidence that the written language of the contract does not reflect the parties' real intention and explaining "how the mistake occurred." *Id.* at 526 (explaining that, in that case, "[t]he uncontroverted testimony" showed that "Continental provided the Release and used a standard form with boilerplate language"; "Sommers, the claims adjuster who negotiated the terms of the settlement on behalf of Continental, did not choose or review the form before Continental mailed it"; and that, "[w]hile the failure of both sides to catch the erroneous language under these circumstances may not be excusable, it is hardly uncommon").

As one California federal district judge recently summarized:

"To state a claim for reformation under California law, a plaintiff must plead that 'by reason of fraud practiced by one of the parties, or of the mutual mistake of the parties or of a mistake of one of them, which the other at the time knew or suspected, there were omitted from the instrument certain material terms and conditions. In other words, that the language of the writing failed, for some reason, to express the

intention of the parties.'" *Leisher v. Wachovia Mortg., Inc.*, 2011 U.S. Dist. LEXIS 3037, 2011 WL 98575 (S.D. Cal.) (quoting *Pascoe v. Morrison*, 219 Cal. 54, 56, 25 P.2d 9 (1933)); *see also* Cal. Civ. Code § 3399 (setting forth when a contract may be revised). "A complaint for the reformation of a contract should allege what the real agreement was, what the agreement as reduced to writing was, and where the writing fails to embody the real agreement. It is also necessary to aver facts showing how the mistake was made, whose mistake it was and what brought it about, so that mutuality may appear." *Lane v. Davis*, 172 Cal. App. 2d 302, 309, 342 P.2d 267 (1959) (quoting *Johnson v. Sun Realty Co.*, 138 Cal. App. 296, 300, 32 P.2d 393 (1934)). "Basic to a cause of action for reformation is a showing of a definite intention or agreement on which the minds of the parties had met which pre-existed and conflicted with the instrument in question." *Appalachian Ins. Co. v. McDonnell Douglas Corp.*, 214 Cal. App. 3d 1, 21, 262 Cal. Rptr. 716 (1989) (internal quotation marks, formatting and citation omitted).

*Nissim v. Wells Fargo Bank, N.A.*, No. C 12-1201 CW, 2013 WL 192903, at *6 (N.D. Cal. Jan. 17, 2013).

For purposes of Humana's request for preliminary injunctive relief, the material dispute on the merits of Humana's mutual mistake claim is whether the parties intended for the Capitated Agreements to be terminable on September 30, 2016, as was the National Agreement, or whether they intended for the term of the Capitated Agreement to be non-terminable (other than for cause) before the effective date of January 1, 2017 and the end of the initial term on December 31, 2018.

According to Humana, "whenever factual disputes must be resolved, the work boils down to competing accounts of one or two key events," and, "[h]ere, attention concentrates on what was said and determined during the parties' pivotal conferences call on March 22 and June 17, 2016," where "Humana's witnesses testified the takeaway was the [Capitated Agreements] would not be tied to the FFS, while Tenet's

witnesses swore to the opposite." Dkt. No. 62 at 4-5.

Humana contends that, "[l]acking any contemporaneous records, the Court necessarily turns to other documentary or circumstantial evidence to decide which narrative is more credible" and "that only Humana's account persuades." *Id.* at 5. According to Humana, the evidence shows persuasively that the Humana's and Tenet's mutual intent was to enter into "a capitated arrangement for Stanislaus and San Joaquin Counties for two years, beginning in January 1, 2017, subject to termination without cause on 90 days written notice, following the initial term, irrespective of the FFS or the status of the national agreement negotiations." *Id.*

Humana argues that "Tenet's defense on mutual mistake – that it knew all along that the [term and termination provision in Section 6.1] in the [Capitated Agreements] as signed by Dozier was inconsistent with Humana's stated position – butts heads with the underlying premise of injunction practice, namely the exercise of the powers of equity to prevent injury," and that Tenet can claim no equity "in asserting that it understood that Humana consistently refused to accede to tying the [Capitated Agreements] to the FFS, and yet mistakenly transmitted documents with the FFS [term and termination provision in Section 6.1], without barely a comment, question or remark from Cirri." *Id.* at 16. According to Humana, "[r]eading the declarations and listening to the evidence indisputably demonstrates there was a mistake in documenting the oral agreement reached by the negotiators." *Id.*

The evidence at the hearing and Humana's counsel's arguments and questioning

of witnesses makes clear that, as Humana acknowledges, its evidence in support of a showing of its likely success comes down to – in addition to the evidence of what Humana's representatives told Tenet's on the conferences call on March 22 and June 17, 2016 and "Humana's continued pursuit of capitated arrangements in the two counties following the March 22, 2016 phone conference" – "Tenet's failure to suitably answer Humana's two central points: (1) It makes no sense – whether common or commercial – to agree to a two year contract terminable before it ever begins; and (2) Tenet never told Humana that its preference to 'align' termination provisions in its contracts with a particular payor was based on an inflexible policy edict from corporate higher-ups." *Id.* at 5 (emphasis removed), 17; *see also id.* at 18 ("Negotiating a contract that can be terminated before it ever begins, that states that it actually incepted years before the subject of the negotiations began, is nothing short of nonsensical, and Tenet's contrary insistence defies both logic and experience.").

Humana also points to the fact that, following the conference call on June 17, 2016, Ms. Lynn "proposed the language that replicated verbatim the unauthorized Gonzalez language, but added a third year to the term of the" Capitated Agreements – which Humana contends is not "evidence of a new agreement between the parties" but is "indicative that back in March, the parties agreed, as Arjoyan and Gonzalez testified, that whatever transpired in the FFS negotiations would not impact the [Capitated Agreements]." *Id.* at 11. And Humana relies on "Cirri's initial suggestion of language suitable for beginning work on the written agreement was a Tenet

template that bore no relation to the FFS at much, with a completely different term and termination provision." *Id.* at 11.

Additionally, Humana points to the fact "that unlike the interaction in June, where Lynn immediately follows up the conference call with an email confirmation of the results of the call (Ex. 26), there is no such confirming email following the March call," which Humana suggests could "be because Lynn concluded that documenting the agreement of that call would not be consistent with her mandate from Hailey and Dozier." *Id.* at 20 n.17; *see also id.* at 9 ("And, crucially, Cirri admitted, after being asked repeatedly and dodging the question with nearly equal frequency, that in a case heavy laden with emails confirming this and disputing that, there is no email from Tenet confirming that as a result of the March 22, 2016 conference call Humana abandoned its persistent demand that the [Capitated Agreements] operate independently from the FFS." (emphasis removed)).

And Humana contends that "[i]t is simply not credible to believe Cirri's claim that she consciously considered the [term and termination provision in Section 6.1] in the [Capitated Agreements] with each exchange with Gonzalez" (1) because, "[g]iven the complexities of capitated, as opposed to fee-for-service agreements, the looming firm CMS deadline for Humana's bid submission, and the rapidity with which Gonzalez and Cirri exchange drafts of the [Capitated Agreements], it is, for anyone who has edited documents with redlines, much more credible to believe that the attention of the negotiators was drawn to the edited elements of the drafts rather than

the unedited portions" – as Gonzalez testified that she did; (2) because "[t]he Court can tell from the extraordinary hours at which emails are sent by these negotiators that they are very busy"; and (3) because Lynn, "the national 'owner' of the relationship with Humana," did not carefully review every provision in each exchanged draft. *Id.* at 16-17 & n.14.

Humana asserts that the evidence shows that "[t]he much more convincing understanding of the evidence is that both Gonzalez and Cirri mistakenly overlooked the incorporation of the [term and termination provision in Section 6.1] from the FFS into the [Capitated Agreements] as they focused attention on the complexity of the capitation provisions" – that is, that "two busy, non-lawyer, experienced negotiators focused their time and attention on the novel element of their agreement, the capitation provisions, and mistakenly ignored the [term and termination provision in Section 6.1] as they scrambled to meet the CMS deadlines." *Id.* at 17 (footnote omitted).

Before the Court turns to assessing the arguments, as a threshold matter, Humana and Tenet disagree on whether the clear-and-convincing-evidence standard that applies on the merits of Humana's mutual-mistake-based reformation claim bears on what Humana must show as to the likelihood-of-success requirement.

Humana notes that, "[w]hile a clear and convincing standard has been applied in the reformation context in California, those authorities speak to the ultimate final judgment of the court" and that, "[i]n California, a mere conflict in the evidence on a material issue of disputed fact forecloses summary judgment in a reformation action."

Dkt. No. 62 at 13 n.11. Humana contends that "[a] party seeking a preliminary injunction need not present proof sufficient to entitle him or her to summary judgment" and that "Tenet's position ignores the settled distinction between actual success from a likelihood of success on the merits." *Id*.

As noted above, the Supreme Court and Fifth Circuit have repeatedly cautioned that district courts should not conflate the required showing of likelihood of success with demonstrating actual success on the merits. That means that a plaintiff seeking a preliminary injunction need not prove that he is entitled to summary judgment or is certain to win.

But there is a difference between a plaintiff's making a sufficient showing to defeat a defendant's motion for summary judgment on the plaintiff's claims and a plaintiff's making a sufficient showing to prove that he is entitled to summary judgment on his own claims. In this circuit, where a summary judgment "movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). That is, he must show that he is certain to win.

Repeating the rule that a preliminary injunction movant need not make that showing but rather must present a prima facie case on the merits of its claim does not answer the question whether a clear-and-convincing standard for prevailing on the

merits of the plaintiff's claim has any bearing on what the plaintiff must show to establish that it is likely to succeed on the merits.

In this diversity case, California's clear-and-convincing-evidence standard would apply in this Court in resolving the merits of Humana's reformation claim. *Cf. Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 748 (5th Cir. 2011) (Louisiana law); *GeoSouthern Energy Corp. v. Chesapeake Operating Inc.*, 274 F.3d 1017, 1021 (5th Cir. 2001) (Texas law). The Supreme Court has advised, as a general matter but in the context of a different question regarding the likelihood-of-success requirement for a preliminary injunction, "that the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). Thus, "[i]n assessing whether the [movant] is entitled to the injunction, the court views the matter in light of the burdens and presumptions that will inhere at trial." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009) (citing *Gonzales*, 546 U.S. at 429).

And, more specifically, the Court agrees with other judges that, "in addressing a motion for preliminary injunction involving a cause of action with a clear and convincing standard of proof, the trial court should determine whether it is more likely than not that the movant will be able to prove the case by clear and convincing evidence." *Canadian Nat. Ry. Co. v. Montreal, Maine & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 421-22 (D. Me. 2011) (citing *Titan Tire*, 566 F.3d at 1379-80).

Measured against this standard, the Court determines that Humana has failed

to make the required clear showing that it is likely to succeed on the merits. As discussed below, Humana has also failed to meet its burden as to irreparable harm, and so cannot, even on a sliding-scale analysis, rely merely on a showing of some likelihood of success on the merits. But, even if it could, the Court determines that Humana has failed to make a clear showing of some likelihood that it will be able to prove its claim for reformation based on mutual mistake by clear and convincing evidence.

Tenet first asserts that there is no "written contract" that is subject to reformation under Section 3399. Simply put, Tenet never signed a written contract that contained the same language in Section 6.1 that was included in the written document that Humana signed. Tenet contends that "[t]here is thus no 'written contract' containing a 'mutual mistake' for the Court to 'reform'" and, "[i]nstead, there are two conflicting versions of the [Capitated] Agreements – one signed by Tenet and one signed by Humana." Dkt. No. 60 at 5.

Humana's response on this point presupposes that Tenet, like Humana, intended the Capitated Agreements to contain the language found in the unilaterally revised Section 6.1 contained in the document that Humana signed and that Tenet only protested about changing to that language because Tenet had, a month after signing the allegedly mistaken version, decided to terminate the FFS and so changed its mind on what it was willing to do as to the termination provisions of the Capitated Agreements. More on that below.

Humana otherwise responds that, contrary to Tenet's assertion, the Capitated Agreements were fully "integrated" and enforceable, as required by California law. Under California "contract law, 'integration' means the extent to which a writing constitutes the parties' final expression of their agreement." *Esbensen v. Userware Int'l, Inc.*, 11 Cal. App. 4th 631, 636 (1992), *reh'g denied and opinion modified* (Jan. 7, 1993). Humana asserts that the versions of the Capitated Agreements signed by Ms. Dozier for Tenet were "integrated" – that is, they were the parties' final expression of their agreement.

But Tenet's argument does not refer to this concept but rather to the fact that there is no one "written contract" that both contracting parties signed because of the material differences in the material terms in Section 6.1 in the versions of the Capitated Agreements signed by Tenet and Humana. Humana's claim, of course, necessarily focuses on the version that Tenet signed because that version contains the allegedly mistaken terms in Section 6.1 that Humana is asking to have reformed in arbitration – there is nothing mistaken, from Humana's perspective, in need of reform in the version signed by Humana.

On the present record, it is unclear if the version signed by Tenet – and never signed by Humana – qualifies as a "written contract" subject to reformation under Section 3399. To the extent that the law may not favor Humana's position, even if it remains a point for some debate and Humana may have some chance of prevailing after an adjudication on the merits, Humana would not be able make a showing of a

substantial likelihood of success. *See La Union*, 608 F.3d at 225.

But the Court does not rely on this point in determining that Humana has not made the required clear showing that it is likely to succeed on its mutual mistake claim. Rather, the Court determines that Humana has not clearly shown some likelihood that it will be able to prove by clear and convincing evidence that it was Humana's and Tenet's mutual understanding, at the time that Tenet signed the Capitated Agreements, to include a term and termination provision that provide for no termination (other than for cause) through an initial term ending on December 31, 2018.

Every draft of the Capitated Agreements, as provided in the first instance by Ms. Gonzalez on behalf of Humana, included a termination provision permitting termination by September 30, 2016, and Ms. Cirri testified that she reviewed those draft provisions in real time. As Tenet points out, the May 12, 2016 email exchange between Ms. Cirri and Ms. Lynn showing that they specifically reviewed and analyzed Section 6.1 before signing the Capitated Agreements undermines Humana's allegation that Humana and Tenet both "inadvertently" signed a written contract containing a mistaken term in Section 6.1. That email exchange predates Tenet's June 15, 2016 notice of non-renewal.

Further, Ms. Lynn reacted within hours when Tenet first received a copy of the Humana-signed version of the Capitated Agreements that included revised terms in Section 6.1, and her objections were consistent with the position that Tenet advanced

before and during the March 22, 2016 conference call.

Humana's reliance on the fact that Ms. Lynn and Ms. Gonzalez sent no email discussing the termination provision after the March 22, 2016 conference call runs up against the fact that Humana's representatives did not, either. And, as Tenet argues, "this argument gets Humana's burden precisely backwards," where "Tenet does not have to show that its intent was reflected in the language of the contract it signed" and where, rather, "Humana has to show – through clear and convincing evidence – that Tenet's intent was different from the language of the agreement." Dkt. No. 60 at 9 (footnote omitted). Further, the day after the March 22, 2016 call, Ms. Gonzalez re-drafted the Capitated Agreements in the form of an amendment to the National Agreement and made termination of the Capitated Agreements specifically subject to Section 6.1 of the National Agreement.

In the face of this evidence, the fact that the parties tried to resolve this material difference following the June 17, 2016 telephone conference, taking the unauthorized Gonzalez language for Section 6.1 as a starting point, is not persuasive evidence of Tenet's intent and understanding up to and including its signing the Capitated Agreements with the original Section 6.1 language on May 12, 2016. And Humana's reliance on the supposed inherent illogic of a contract's permitting termination prior to its effective date and on its assertions (based on suppositions and inferences) that Ms. Cirri must now be lying about reviewing Section 6.1 in the exchanged drafts do not suffice, alone or in combination with any of its other evidentiary assertions, to clearly

show some likelihood that Human will be able to prove mutual mistake by clear and convincing evidence. That is particularly so where the Court found Ms. Cirri's testimony at the hearing on these points credible.

In short, Humana has not met its burden to clearly show that it is likely to succeed on the merits of its claim for reformation based on mutual mistake by showing that, at the time that Tenet signed the Capitated Agreements, Tenet and Humana shared the mutual understanding – contrary to (and so subject to a shared misconception regarding) the language included in the many exchanged drafts and the version that Tenet signed – that the agreements would provide for no termination (other than for cause) through an initial term ending on December 31, 2018.

And, of course, if Humana is seeking a mandatory injunction, Humana has, based on the same analysis, failed to show a clear entitlement to preliminary injunctive relief under the facts and the law – that is, Humana has failed to show that the facts and law are clearly in its favor on its mutual mistake claim.

### iii.  Newly-raised, unpleaded theories or causes of action

For the first time in its post-hearing brief, Humana asserts that it "has certainly demonstrated some likelihood of success on each of its three grounds for reformation: mutual mistake, unilateral mistake, and fraud." Dkt. No. 62 at 14. Humana acknowledges that neither unilateral mistake nor constructive fraud was a ground for reformation "asserted at the time of the filing of the original or amended ex parte application" but contends that this was "because Humana had no knowledge that Tenet

would vigorously deny that there had been a mutual mistake." *Id.* at 18 n.16, 20 n.18.

According to Humana, "[t]he parties agreed that limited discovery could be undertaken, and during the course of that discovery, this basis for relief became apparent. Therefore, it is appropriate, if the Court deems it necessary, to permit the requisite amendment to conform to proof under Rule 15 in order to bring the pleading into line with the issues actually developed during the hearing." *Id.* at 18 n.16 (citing *Mongrue v. Monsanto Co.*, 249 F.3d 422, 427 (5th Cir. 2001) ("A party has presented an issue in the trial court if that party has raised it in either the pleadings or the pretrial order, or if the parties have tried the issue by consent under Federal Rule of Civil Procedure 15(b). An issue must be presented so as to put the opposing party and the court on notice that it is being raised." (footnote and citations omitted))).

Tenet has filed a Motion to Strike all references to unilateral mistake and constructive fraud in Humana's closing brief. *See* Dkt. No. 64 (the "Motion to Strike"). Tenet asserts that, "[i]n its post-hearing Closing Brief, Humana asks the Court to grant its preliminary injunction based on two unpleaded claims – for 'unilateral mistake' and 'constructive fraud' – that appear nowhere in Humana's injunction moving papers and, indeed, have not been raised anywhere in the history of the case prior to them appearing in Humana's Closing Brief" and that, "[i]n so doing, Humana violated two basic axioms of federal civil practice: first, that a party may not obtain relief on the basis of unpleaded claims and second, that a movant may not obtain relief on the basis of claims not raised in its moving papers." *Id.* at 1.

According to Tenet, "[b]oth axioms serve an important purpose – to provide the non-moving party with fair notice of the claims on which the movant's requested relief is based and prevent a trial by ambush." *Id.* at 1-2. Tenet contends that, "[w]hile Humana's attempted post-hearing ambush is understandable – the hearing evidence plainly eviscerated its sole and exclusive pleaded claim for mutual mistake – it invites this Court to commit error" and that the "Court should decline Humana's invitation and strike all references to these two unpleaded claims from Humana's Closing Brief." *Id.* at 2.

Tenet asserts that "[n]owhere in [Humana's First Amended] Complaint does Humana plead an alternative theory of unilateral mistake or constructive fraud. Nor does Humana make any factual allegations that would support such a claim. To the contrary, Humana alleges – twice – that the 'mistake' was a product of Tenet's 'inadvertence' – an allegation entirely inconsistent with unilateral mistake or constructive fraud." *Id.* at 3. And, Tenet notes, "Humana's Motion for a Preliminary Injunction embraces the same sole and exclusive theory of liability: mutual mistake." *Id.* (footnote omitted).

Tenet contends that, "[c]onsistent with Humana's [First Amended] Complaint and its moving papers, both the arguments of counsel and testimony of witnesses at [the evidentiary] hearing focused exclusively on Humana's asserted mutual mistake theory of reformation. Humana's counsel made a thirty minute open statement – and never once mentioned fraud or unilateral mistake. Tenet's counsel's opening statement

-71-

was similarly directed exclusively at legal and factual arguments regarding Humana's mutual mistake claim. And all four witnesses were directed and cross-examined based on that same, solitary theory of liability." *Id.* at 4. Tenet recounts that, "[a]t the conclusion of the evidentiary hearing, the parties agreed to file post-hearing 'Closing Briefs' to summarize the facts and law supporting their respective positions on the [Amended Motion for a Preliminary Injunction]. And because the Motion had been previously briefed by both sides, the parties agreed to a simultaneous filing of these Closing Briefs on November 16, 2016 at 7 p.m. CST." *Id.*

Where, Tenet contends, "[t]he purpose of a party's moving papers is to provide the non-moving party with fair notice of the relief requested and the bases for that relief" and "[t]his need is particularly heightened when the motion at issue is evidentiary in nature, requiring the non-moving party to marshal its evidence to defend against the noticed bases," "Humana's attempt to ambush Tenet with new bases for relief – after evidence has been closed and in simultaneously-filed closing briefing – has denied Tenet the right to take discovery, cross examine Humana's witnesses, or provide briefing to this Court on these untimely-raised claims." *Id.* at 5-6 (emphasis removed).

Humana responds that its "evidence for these [unpleaded] theories is primarily a previously-undisclosed inflexible policy by Tenet's upper management, and in particular Clint Hailey, that the termination provisions of all contracts involving a single payor had to be 'aligned'"; that it could not "plead these theories when the

evidence supporting them was in Tenet's exclusive control, and not introduced into the case until a scant four days before the hearing"; and that, "in all Tenet's previous filings in opposition to Humana's application this unyielding policy had never been mentioned." Dkt. No. 66 at 1. Humana contends that Tenet should not be heard to complain where, "after hiding the ball throughout all of October, Tenet unveils this evidence on November 4, 2016, during Dawn Cirri's deposition, and then cries 'foul' after the evidence it affirmatively introduced via Cirri's direct examination is used against it." *Id.* at 1-2.

According to Humana, "[h]aving introduced this evidence during the hearing, Tenet is in no position to complain that Humana put it to use. If Tenet is surprised, it has only itself to blame. Humana has consistently relied on California Civil Code section 3399 as its basis for relief on its reformation count. So this ground for relief has been a mainstay in the case." *Id.* at 2. Humana notes that it pointed out in its Closing Brief that "the statute expressly permits reformation when one party is mistaken, and the other party knows or suspects that the other is acting under a unilateral mistake" and that "California decisional authority supports granting reformation in the face of constructive fraud." *Id.* Humana therefore asserts that "these theories merely apply recently discovered facts to settled principles of law that have always been a foundation for Humana's claims for relief." *Id.*

Humana further reports that "not until the very last day of the hearing and through the final witness is there evidence of an overarching policy of Tenet's that

made it impossible for it to come to terms with Humana on the termination issue" and contends that "Tenet withheld, for whatever reason, the evidence making theories of unilateral mistake and constructive [fraud] viable" before, "during its own case (either during direct examination of Cirri, or the cross examination of the Humana witnesses), present[ing] this evidence to bolster its position that there was not mutual mistake, while proving that Tenet representatives may well have induced whatever mistake Humana labored under." *Id.* at 3. Humana asserts that "Tenet knew about the evidence of the inflexible policy, and chose not to disclose it by inference until the deposition of Cirri on November 4, 2016, and explicitly until her testimony on November 14, 2016," while "Humana had no way of knowing that this evidence existed, and accordingly could not move to amend any earlier, particularly given the press of time in light of the timing of the hearing, and the fast approaching end of the Open Enrollment period." *Id.* at 4. According to Humana, "Tenet presented the evidence about both the unilateral mistake and the constructive fraud, showing that Cirri knew all along that Tenet's policy forbid disengaging the [Capitated Agreements] from the FFS, and yet she did not disclose this inflexible edict from management, nor did she alert Gonzalez that the Humana position, clearly articulated in the March 22, 2016, conference call could never be acceded to by Tenet. Tenet has obviously consented to have the ramifications of that evidence tried in the preliminary injunction proceeding." *Id.* at 4-5.

Humana's counsel also submitted a declaration in which he attests that,

"[a]lthough at the outset of the hearing, the evidence on the subject of unilateral mistake induced by another, or constructive fraud had not yet been fully developed, were a closing permitted this subject may have been discussed" and that "[a]t no time did I intend to conceal the possibility that these issues might be raised on Humana's behalf from Tenet's counsel." Dkt. No. 66-1 at 3.

Tenet replies Humana's argument that "Tenet 'chose not to disclose' until 'four days before the hearing' that its intent all along was to align the termination provision in the Capitated Agreements with the National Agreement" "is meritless – both factually and legally." Dkt. No. 68 at 1. Tenet contends that it "has loudly proclaimed this fact from the beginning of this case" and that Humana knew this since at least October 10, 2016, when Tenet filed its opposition to the Amended Motion for a Preliminary Injunction, and "yet did nothing to amend its pleadings or moving papers to provide Tenet with fair notice of its new claims." *Id.* at 1-2.

Tenet further asserts that "it is immaterial when Humana learned that Tenet's signing of the Agreement was not an 'inadvertent mistake'" because "[i]t doesn't change the legal reality that a party simply cannot obtain relief in federal court on unpleaded claims and allegations" and "plenty of courts have applied the same rule in the preliminary injunction context." *Id.* at 2 (footnote omitted; emphasis removed; citing, among others, *United Motorcoach Ass'n, Inc. v. City of Austin*, A-13-CA-1006-SS, 2014 WL 1091966, at *8 (W.D. Tex. Mar. 17, 2014)). According to Tenet, "[b]y waiting to raise these claims for the first time in its post-hearing briefing, Humana has denied

Tenet [the required] 'fair notice' and corresponding 'fair hearing.'" *Id.* at 2-3 (footnote omitted).

As an initial procedural matter, Federal Rule of Civil Procedure 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). But Rule 12(f) only applies to pleadings as defined by Federal Rule of Civil Procedure 7(a). *See, e.g.*, 5C Charles Alan Wright et al., FED. PRAC. & PROC. 1380 & n.8.5 (3d ed. 2012) ("Rule 12(f) motions only may be directed towards pleadings as defined by Rule 7(a); thus motions, affidavits, briefs, and other documents outside of the pleadings are not subject to Rule 12(f)."); *Groden v. Allen*, No. 3:03-cv-1685-D, 2009 WL 1437834, at *3 (N.D. Tex. May 22, 2009) (Rule 12(f) "does not permit the Court to strike motions or matters within them because the rule applies only to pleadings"). Outside of Rule 12(f), the Federal Rules of Civil Procedure do not otherwise contemplate motions to strike. *Accord* Dkt. No. 66 at 1 n.1. Further, "[a]s a general matter, motions to strike are disfavored and disserve the interest of judicial economy." *Cooper v. Dallas Police Ass'n*, No. 3:05-cv-1778-N, 2013 WL 1787564, at *6 (N.D. Tex. Apr. 5, 2013) (citing *Murray v. TXU Corp.*, No. 3:03-cv-888-P, 2005 WL 1313412, at *4 (N.D. Tex. May 27, 2005); *United Steel, Paper & Forestry v. Graphic Packaging Int'l, Inc.*, No. 06-C-1188, 2007 WL 2288069, at *3 (E.D. Wis. Aug. 4, 2007)), *rep. & rec. adopted*, 2013 WL 1787563 (N.D. Tex. Apr. 26, 2013).

Tenet may have filed the Motion to Strike because its counsel saw no other

obvious vehicle to raise Tenet's concerns where the procedural posture and timing concerns facing the Court counseled in favor of only one round of simultaneously-filed post-hearing briefing. And, in that spirit, the Court permitted a response to the Motion to Strike and reply in support of the motion to be filed.

But, even if Tenet is right on the substance of its concern, the Court does not see the point in striking portions of Humana's closing brief as opposed to simply addressing the substance of its alternative requests under Federal Rule of Civil Procedure 15. *See* Dkt. No. 64 at 5 ("Accordingly, the Court should strike any references in Humana's Closing Brief to these two, unpleaded claims. And, more importantly, the Court should not grant any relief based upon these unpleaded claims – a result that would constitute clear, reversible error.").

To that the Court now turns.

Federal Rule of Civil Procedure 15 provides

(a) Amendments Before Trial.
    (1) Amending as a Matter of Course. A party may amend its pleading once as a matter of course within:
        (A) 21 days after serving it, or
        (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.
    (2) Other Amendments. In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

    (3) Time to Respond. Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

(b) Amendments During and After Trial.

(1) Based on an Objection at Trial. If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

(2) For Issues Tried by Consent. When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

FED. R. CIV. P. 15(a)-(b). Humana does not contend, and the record does not support a finding, that Tenet gave its express consent to litigate the Amended Motion for a Preliminary Injunction based on previously unpleaded and unraised claims for constructive fraud and reformation based on unilateral mistake. And Humana has not moved to amend its First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a) but rather invokes Rule 15(b) in support of its request. *See* Dkt. No. 62 at 18 n.16, 20 n.18.

The issue, then, is one of post-hearing amendment by implied consent. "In general, a finding of implied consent depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial. Where a party does not recognize the significance of evidence and so fails to contest it, he cannot realistically be said to have given his implied consent to the trial of unpled issues suggested by it, always assuming that his failure to grasp its significance was reasonable." *Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. Indep. Ref. Co.*, 783

F.2d 1185, 1188 (5th Cir. 1986) (citations and internal quotation marks omitted).

"Whether an issue has been tried with the implied consent of the parties depends upon whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond." *United States v. Shanbaum*, 10 F.3d 305, 312-13 (5th Cir. 1994). "[T]rial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), that such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process." *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 422 (5th Cir. 1981).

"The raising party must present the issue so that it places the opposing party and the court on notice that a new issue is being raised." *Portis v. First Nat. Bank of New Albany, Miss.*, 34 F.3d 325, 331 (5th Cir. 1994), *as amended on denial of reh'g* (Nov. 10, 1994). Even if the opposing party failed to object to evidence supporting issues that go beyond the pleadings, unless the opposing party could be reasonably expected to have recognized that the new issue or claim was being raised, the Court cannot hold that it consented to trial of a new issue or claim. *See id.* at 332; *accord Moody v. FMC Corp.*, 995 F.2d 63, 65-66 (5th Cir. 1993) ("A party does not consent to try new issues unless he could reasonably be expected to recognize that a new issue entered the case. Nor does a party consent to try a new issue by introducing evidence or failing to object to evidence when the evidence is relevant to pleaded issues in the

case." (citations omitted)).

"Whether the parties recognized that the unpleaded issue entered the case at trial often depends on whether the evidence that supports the unpleaded issue is also relevant to another issue in the case. If the evidence that supports the unpleaded issue is also relevant to another issue in the case, the introduction of this evidence may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue." *Id.* at 313 (internal quotation marks omitted). "When evidence is introduced that is relevant to a pleaded issue and the party against whom the amendment is urged has no reason to believe a new issue is being injected into the case, that party cannot be said to have impliedly consented to trial of that issue." *Domar*, 783 F.2d at 1118.

The Fifth Circuit has held that an opposing party may "be prejudiced by having to defend against a new theory of liability first introduced at the close of trial." *Smith v. EMC Corp.*, 393 F.3d 590, 597 (5th Cir. 2004). The Court of Appeals has explained that "Rule 15(b) sets the standard for ruling on post-trial motions to amend to conform the pleadings to the evidence and lack of prejudice by [the opposing party] [is] not sufficient grounds under that rule to permit the amendment; consent to the amendment by [the opposing party] was required. Rule 15(b) recognizes that basic fairness entitles a defendant to notice, before trial, of who sued it and the nature of the claims being asserted against it. It may well be impossible for a party to articulate particular grounds of prejudice when the court permits a party to make post-trial

amendments and allege new issues which the party has not had an opportunity to investigate or even consider." *Domar*, 783 F.2d at 1189.

The Fifth Circuit has approved applying Rule 15(b) to permit late amendments to support a motion for a preliminary injunction. *See, e.g.*, *Apple Barrel*, 730 F.2d at 388-89. But, for example, in *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384 (5th Cir. 1984), the unpleaded "theory was propounded by plaintiffs throughout the trial"; "[a]t the preliminary injunction hearing, plaintiffs introduced testimony and submitted arguments in opening and closing in support of [the] theory"; and "plaintiffs specifically urged the court to order relief based on this theory in a memorandum in support of their request for a preliminary injunction, which was submitted prior to the hearing." 730 F.2d at 388-89.

Further, Federal Rule of Civil Procedure 65(a)(1) provides that "[t]he court may issue a preliminary injunction only on notice to the adverse party." FED. R. CIV. P. 65(a)(1). As the Supreme Court long ago explained, "[t]he notice required by Rule 65(a) before a preliminary injunction can issue implies a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cty.*, 415 U.S. 423, 432 n.7 (1974). A few years earlier, the Fifth Circuit similarly noted that "[t]he right of defendants to present controverting factual data is illusory unless there is adequate notice of plaintiffs' claims" and that "[i]t goes without saying that the requirements of a fair hearing include notice of the claims of the

opposing party and an opportunity to meet them." *Marshall Durbin Farms, Inc. v. Nat'l Farmers Org., Inc.*, 446 F.2d 353, 356 (5th Cir. 1971) (internal quotation marks omitted).

In this case, Humana filed its First Amended Complaint (the live pleading at this time) for the purpose of obtaining a temporary restraining order and a preliminary injunction "to maintain the status quo so that the dispute may be resolved through the pending arbitration." Dkt. No. 13 at 3. Humana explained that, "pursuant to the arbitration provision in the subject contract, Humana filed a demand for Arbitration with the American Health Lawyers Association on September 19, 2016" – a copy of which it attached to its complaint – and that, "[a]mong the remedies sought in the Demand for Arbitration is reformation of the Capitated Agreements to reflect the agreed commencement date of January 1, 2017, and the agreed termination date of December 31, 2018 and for breach of contract, insofar as Tenet refuses to adhere to these mutually agreed dates." *Id.* at 2. Humana based its reformation claim in its complaint and its arbitration demand on a theory of mutual mistake. *See id.* at 2, 5; Dkt. No. 13-1 at 3, 5. Humana contends in its First Amended Complaint that "the Court should stay any final adjudication on the merits of the reformation pending completion of the arbitration." Dkt. No. 13 at 8.

Humana's Amended Ex Parte Application for a Temporary Restraining Order and Motion for a Preliminary Injunction seeks injunctive relief based only on its pleaded claim for reformation based on a theory of mutual mistake. *See* Dkt. No. 14;

Dkt. No. 28; Dkt. No. 48. So far as the Court is aware, Humana is still pursuing only its mutual mistake and breach of contract claims in the arbitration, pending which it seeks only preliminary injunctive relief from the Court and asks the Court to hold off on otherwise adjudicating its claims. Although Humana now reports that during the course of discovery in the last few weeks the bases for relief of unilateral mistake and constructive fraud became apparent, Humana's counsel and witnesses did not raise a unilateral mistake theory for reformation or a claim of constructive fraud during the three-day evidentiary hearing. *See* Dkt. No. 63.

Humana has only raised these theories and asked for post-hearing amendment under Rule 15(b) in its closing brief, which it knew was being simultaneously filed with Tenet's post-hearing brief and would be each party's last submission before the Court rules on the Amended Motion for a Preliminary Injunction. Humana is, therefore, now asking the Court to grant injunctive relief pending and in service of an arbitration in which these new claims or theories have apparently not yet been raised.

Humana presents no argument to support a determination that the evidence to which it points in support of unilateral mistake or constructive fraud was not also relevant to the parties' litigating Humana's likelihood of success on the merits of its mutual mistake claim. And, as even Humana appears to concede (at least in part), all the evidence that Humana points to clearly is. *See* Dkt. No. 62 at 3-4, 19-21; *see also* Dkt. No. 66 at 3 ("[Tenet] then during its own case (either during direct examination of Cirri, or the cross examination of the Humana witnesses), presented this evidence

to bolster its position that there was not mutual mistake, while proving that Tenet representatives may well have induced whatever mistake Humana labored under."); *compare Wallin v. Fuller*, 476 F.2d 1204, 1210 (5th Cir. 1973).

And Tenet would clearly be prejudiced by considering a new claim or theory now – following a three-day evidentiary hearing, before which Humana reports that it recognized these new, unpleaded bases for relief but before, during, or immediately after which it did not raise them with the Court or Tenet's counsel. Both sides recognize that time is of the essence for a ruling on Humana's request for a preliminary injunction, with the TRO to expire no later than December 1, 2016 and the open enrollment period set to close on December 7, 2016.

Although the Court understands how fast-moving and fluid proceedings on a preliminary injunction motion may be, the Court determines that, under all the circumstances, Tenet could not reasonably be expected to recognize the significance of the evidence to which Humana now points for a new claim or theory and therefore, consistent with Rules 15(b) and 65(a), cannot realistically be said to have been on fair or adequate notice of – or to have given its implied consent to – the consideration of these unpleaded matters as a basis for Humana's Amended Motion for a Preliminary Injunction.

That a claim for reformation based on unilateral mistake may also be based on California Civil Code § 3399 or that Humana has always, at a general level, sought reformation is no answer where the record clearly reflects that Humana had previously

raised and pursued only a claim based on mutual mistake and did not previously plead any factual basis for recovery on these theories.

And, whatever pleading amendment Humana may or may not be permitted in the future outside of this preliminary injunction context, the result here is no different insofar as Humana is – it would seem for the first time in responding to Tenet's Motion to Strike – invoking Rule 15(a). *See generally Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 546 (5th Cir. 1983) ("Under Fed. R. Civ. P. 15(a), permission to amend 'shall be freely given when justice so requires.' Although our review is limited to determining whether the trial court's decision is an abuse of discretion, the policy of liberal amendment directs that 'unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial.' The most common factors justifying such a denial are undue delay, bad faith, repeated failure to amend, and unfair prejudice to the opposing party." (citation omitted)); *see also Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) ("In deciding whether to grant leave to amend, the district court may consider a variety of factors in exercising its discretion, including undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, and futility of the amendment."); *Lowrey v. Texas A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997) (same). Even if analyzed under Rule 15(a)'s rubric, the amendment requested to be permitted at this time for purposes of the Amended Motion

for a Preliminary Injunction is, in this particular context, due to be denied, for the reasons explained above, based on undue delay and unfair prejudice to the opposing party. *See generally Lowrey*, 117 F.3d at 246 & n.2 (explaining that "the touchstone of the inquiry under rule 15(a) is whether the proposed amendment would unfairly prejudice the defense by denying the defendants notice of the nature of the complaint" and that, in that case, "the proposed amendment merely stated alternative legal theories for recovery on the same underlying facts, rather than fundamentally altering the nature of the case").

Humana's reliance on *Macklin v. Petrolia Consol. I.S.D.*, No. 7:14-cv-96-O, 2014 WL 4815721, at *2 (N.D. Tex. Sept. 29, 2014), is not persuasive where the district court there permitted amendment in the face of a motion to dismiss – not just before and as a basis for granting preliminary injunctive relief – and where the requests for a temporary restraining order and preliminary injunctive relief were being denied as moot.

For all of these reasons, the Court denies Humana's request to, in the alternative, consider whether a preliminary injunction should be granted because Humana has shown a likelihood of success on unpleaded claims for reformation based on unilateral mistake and constructive fraud. And, for the reasons discussed above, Tenet's Motion to Strike [Dkt. No. 64] will be terminated as moot.

B.    Likely irreparable harm in the absence of preliminary relief

As to irreparable harm, Humana contends that "only the most callous would

-86-

deny that these facts present an extraordinary circumstance," where "[i]t is undisputed that there are over 6700 senior citizens currently enrolled in the Humana Medicare Advantage product, who face the loss of an important hospital – and likely one to which their primary care physicians have admitting privileges – from their network of healthcare facilities" and where, "[e]ven were the entire roster of Medicare Advantage enrollees sufficiently nimble to navigate their way to a new Medicare Advantage plan (a very unlikely proposition), doing so would entail thousands of hours, accompanied by an immeasurable degree of inconvenience, and in all likelihood anxiety." Dkt. No. 62 at 14 n.12. According to Humana, "more than 6,500 elderly Medicare Advantage enrollees will confront considerable disruption of a core aspect of their lives – the predictable provision of hospital services – if injunctive relief is denied." *Id.* at 16.

And, Humana asserts, "Tenet offered no evidence on irreparable harm, but relied instead on the cross-examination of Jerry Adams to rebut Humana's showing," and "[t]he attacks on Adams' testimony focused primarily on a purportedly disqualifying lack of any published studies or investigation beyond his experience to support his opinions, and on the claim that whatever harm Humana will suffer as a result of the termination of the FFS and the [Capitated Agreements] is self-inflicted." *Id.* at 21. Humana contends that "[n]either challenge merits denial of the preliminary injunction." *Id.*

According to Humana, "[t]he gist of Adams' testimony is that given the timing of the present circumstances if the TRO expired there would be lot of confusion

amongst the 6,700 Humana's Medicare Advantage members, coupled with ill-will and a lack of trust because Humana's marketing, listing Tenet as an in-network provider, would make it appear as if Humana pulled a 'bait and switch' on its members," and "[t]hey may also have to find new primary care physicians, to whom, Adams' experience, members are very attached." *Id.* Humana explains that Adams also testified that "[t]here would be a potential loss of revenue to the broker community, which would make Humana's ability to sell the Medicare Advantage product in the two counties 'tenuous at best,'" and that "[t]hose members who purchased Humana's Medicare Advantage plan through exclusive Humana sales agents (roughly 2,000 members) would have to find new brokers through whom they could buy replacement coverage." *Id.* And, Humana contends, based on "Adams' testimony that the relationship between a Medicare Advantage enrollee and his or her primary care physician was a greater attachment than with a spouse, [] it becomes clear Humana has shown irreparable harm as to those enrollees." *Id.* at 23.

Finally, as to Tenet's argument that "Humana's harm is self-inflicted and that it moved for relief too late," Humana asserts that it "needed, and thought it found in Tenet, a partner to share financial risk in serving Medicare Advantage members in the two counties"; that, "[w]ithout such a partner, it would have exited"; that "every notice of non-renewal is the starting gun of negotiations in managed healthcare"; that "[t]he negotiations went through the summer, right up to the time of seeking injunctive relief"; and that "[t]he evidence is that it would have been irresponsible for Humana

to notify members of the termination prematurely, because of the possibility of coming to terms with Tenet." *Id.* at 23-24. And Humana argues that "there is a good explanation for the delay," where "[b]oth sides acknowledge that there were negotiations and cooperation continuing throughout the summer and early fall of 2016" and it would have made little or no "sense ... to proceed prematurely to litigation if there was still an opportunity for compromise, which would certainly be dashed by a precipitously filing in court." *Id.* at 24 n.22. Noting the decision in *ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 699 (N.D. Tex. 2015), in which "injunctive relief was granted despite an eight month delay while the plaintiff conducted factual investigation," Humana contends that, "here, whatever delay followed the June 17 phone conference was clearly a result of the shared recognition that the parties were, after the [notice of non-renewal dated June 15, 2016 (Ex. 20)], in negotiation." *Id.*

Tenet contends that, although Humana offered Adams's testimony of what Adams himself "characterized as 'speculat[ion] about what might happen in these two counties' if the injunction was not granted," "[f]or four independent reasons, this evidence is woefully insufficient to permit injunctive relief." Dkt. No. 60 at 11.

First, Tenet asserts that "Humana's 'speculative' evidence of 'what might happen' is legally insufficient," where Supreme Court precedent requires that Humana demonstrate that irreparable injury is likely in the absence of an injunction and not merely that there is a possibility of irreparable harm. *Id.* (citing *Winter*, 555 U.S. at 22). "This means that mere speculation about possible [harm] is insufficient evidence

of irreparable harm" and that, "[w]here a movant cannot clearly demonstrate likely irreparable harm by nonspeculative, independent proof, then no injunction may issue." *Id.* at 12 (footnotes and internal quotation marks omitted).

Tenet contends that Adams's "'speculation' centered on three alleged 'possible' harms to Humana and/or its enrollees: that denial of an injunction could 'probably cause a lot of confusion' for enrollees, that 'maybe' some enrollees would need to switch to a new primary care physician or specialist, that some enrollees 'might also' need to switch the medication from one formulary to another." *Id.* (footnotes omitted).

And, Tenet notes, "Adams implied that if these 'speculative' harms materialized, they might have an impact on Humana's 'reputation,' though he did not explain how or why." *Id.* (footnote omitted). According to Tenet, "Humana offered no testimony from Mr. Adams or any other witnesses regarding how or why his 'speculation' about what might happen to enrollees if the injunction was denied would affect Humana's reputation in an irreparable manner," and "[t]his evidentiary omission is dispositive as 'the showing of reputational harm' for purposes of an injunction 'must be concrete and corroborated, not merely speculative.'" *Id.* at 12 n.53 (quoting *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *3 (E.D. Tex. Dec. 23, 2015), *report and recommendation adopted*, 2016 WL 231160 (E.D. Tex. Jan. 19, 2016)).

Second, Tenet explains that "Humana admits that there will be no irreparable harm if the injunction is denied before the end of the open enrollment period" on

-90-

December 7, 2016. *Id.* at 14. Tenet notes that, "[s]o long as an enrollee learns the information 'before the beginning of the [October 16th] enrollment period,' Mr. Adams testified it was 'no big deal'" and that Mr. Adams confirmed that Tenet informed its enrollees at least twice and in writing – in June and August of 2016 – that the two hospitals were out of network." *Id.* (footnotes omitted). "But even if these enrollees had not been paying attention to these letters, Ms. Arjoyan and Mr. Adams agreed that, provided the Court acts expeditiously, denying the injunction will still leave enrollees with 'sufficient time' to evaluate their options and enroll in a different plan if keeping their doctor or hospital is a deal-breaker for them." *Id.* at 15 (footnote omitted).

Third, Tenet asserts that "[a]ny speculative harm that does materialize is caused by Humana's inexplicable four-month delay in seeking injunctive relief." *Id.* Tenet notes that Humana originally sent notice letters in June and August to enrollees and removed the Manteca and Modesto hospitals from Humana's online provider directories but then, on "October 4, 2016, when Humana's ex parte TRO was granted," "Humana abruptly reversed course, updating its directories to state that the hospitals were in network and instructing its brokers and agents to tell enrollees the same thing." *Id.* at 15-16. According to Tenet, "Mr. Adams confirmed that Humana bears sole and exclusive blame for any enrollment-period 'confusion' about whether the Tenet hospitals are in or out of network." *Id.* at 15. And, Tenet contends, Humana "could have sought injunctive relief at any time in the four months preceding the beginning of the October enrollment season," where "[s]uch an action would have avoided the

need to hold a temporary injunction hearing in the middle of that open enrollment period," and, "after obtaining the TRO, Humana could have chosen to continue its then-present course of representing to enrollees that the hospitals were out of network until it obtained a preliminary injunction ruling," which "approach would have been the least risky option, particularly if minimizing confusion to enrollees was Humana's principal goal." *Id.* at 16. "Instead, Humana chose to wait until the eve of enrollment season to seek a TRO" and, "after obtaining that TRO, [] chose to tell its enrollees that the hospitals were in network – knowing that if its forthcoming preliminary injunction was denied, these representations would have to be withdrawn." *Id.*

Tenet argues that, "if enrollees are 'confused' as a result, Humana cannot plausibly blame Tenet for that" and cannot use the risks that it has needlessly created through its own choices – and could have easily avoided through different choices – as the basis to argue that it is facing irreparable harm." *Id.* at 16-17.

Fourth, Tenet asserts that "Humana's unexplained delay in seeking injunctive relief defeats its claim that it faces irreparable harm." *Id.* at 17. According to Tenet, "Humana does not dispute that it delayed nearly four months after learning about the alleged 'mutual mistake' in the [Capitated] Agreements to seek injunctive relief," and Humana has not "offered any explanation for that delay other than that it was 'engaging in settlement discussions' with Tenet." *Id.* at 17-18. But, Tenet notes, "courts have held that such explanations – without more – are insufficient." *Id.* at 18 (footnote omitted). "As the *Pruvit* court observed in rejecting a similar argument, 'although

Defendants contend that there was no delay because they were attempting to reach an [settlement] agreement ... the Court does not find this argument persuasive. If the alleged harms to Defendants are indeed as detrimental as Defendants assert, Defendants would have sought injunctive relief as soon as practicable after [notice of the conduct].'" *Id.* (quoting *Pruvit*, 2015 WL 9876952, at *8).

The Court determines that Humana has failed to make the required clear showing that it or its enrollees are likely to suffer irreparable harm in the absence of preliminary injunctive relief.

Even assuming that Mr. Adams properly offered his opinions as a lay witness, his testimony does not establish that Medicare Advantage enrollees are likely to suffer irreparable injury if the Court does not grant a preliminary injunction as requested. The open-enrollment period remains open at this time, and the mere possibility that some enrollees will find it difficult to, if they need to do so, switch Medicare Advantage plans (and possibly, correspondingly, switch medication from one formulary to another) or, instead, switch their primary care physician does not meet the standard for showing likely irreparable harm by nonspeculative, independent proof. And, for the reasons explained by Tenet, the record shows that any confusion among enrollees as to the availability of coverage at the Manteca and Modesto hospitals is the result of Humana's conduct before and after seeking and obtaining the TRO. Likewise, the possible harm to brokers is, by its own terms, monetary injury that can be compensated by damages – other than, perhaps, the alleged reputational harm to, or

loss of good will by or between, brokers and Humana, as to which Humana has not attempted to provide any concrete evidence.

And, although there is some evidence – including from Ms. Lynn – that Humana's representatives and Tenet's representatives continued to have occasional discussions about a possible resolution short of litigation, perhaps even up to or after Humana made its arbitration demand or filed its first request for injunctive relief, the Court finds that Humana's explanations for its delay in seeking injunctive relief are not persuasive. If the alleged harms to Humana and its enrollees are serious as alleged, Humana would have sought injunctive relief as soon as practicable and certainly at some point during the summer when negotiations on the Capitated Agreements had essentially broken off and prior to mere days or weeks before the termination date and the start of the open-enrollment period. While Humana now contends that it waited to demand arbitration or seek injunctive relief while it waited to see how negotiations on a national agreement would turn out and continued to have some discussions with Tenet's representatives about the Capitated Agreements, Humana could have pursued its claim for reformation based on mutual mistake at any time after negotiations on a revised term and termination provision ended, by no later than early July. The basis for Humana's mutual mistake claim has not changed since the time that the parties first signed versions of the Capitated Agreements in May and then had discussions about the disagreement regarding the termination provision in mid-June.

C.     Balance of equities and the public interest

As to the third and fourth preliminary injunction factors, Humana contends that "Tenet has made no showing that the public interest would not be furthered by maintenance of the status quo of keeping the two hospitals in-network for the Medicare Advantage enrollees"; that Tenet has not "suggested any prejudice whatsoever flowing from a requirement that it admit Humana's Medicare Advantage enrollees to the two hospitals on either a fee-for-service or a capitated basis, pending the arbitration's outcome"; that "under the TRO Tenet gets patient patronage and will be compensated according to one of two reimbursement models if the preliminary injunction issues"; and that, "[i]f the TRO expires, Tenet will lose patient traffic because the primary care physicians will no longer refer Humana's Medicare Advantage enrollees to Tenet's out-of-network hospitals." Dkt. No. 62 at 20.

For its part, Tenet asserts, without further explanation, that, "[f]or all the reasons set forth above, both the balance of the equities and the public interest weighs in favor of denying the injunction" and that, "[i]n any event, [] because Humana has failed to carry its burden on the first two factors, the Court need not address the remaining preliminary injunction factors." Dkt. No. 60 at 18 (footnote omitted).

The Court determines that Humana has failed to make a clear showing that it is likely to succeed on the merits or that it or its enrollees are likely to suffer irreparable harm in the absence of preliminary relief. Accordingly, the Court may deny the Amended Motion for a Preliminary Injunction and need not address the remaining

two requirements for preliminary injunctive relief – whether the balance of equities

tips in Humana's favor and an injunction is in the public interest. *See, e.g., Heil*, 542

F. App'x at 332 ("In this case, the district court found that Heil had not carried its

burden to demonstrate that its claim for misappropriation of trade secrets was

substantially likely to succeed on the merits, that irreparable injury would likely result

from the alleged misappropriation of trade secrets, or that the balance of hardships

favored a preliminary injunction. The district court therefore had no need to address

the effect of the requested injunction on the public interest."); *Torres v. Cty. of Webb*,

150 F. App'x 286, 292 (5th Cir. 2005) ("Torres contends the district court erred in

denying her preliminary equitable relief because the court considered only one of the

four prerequisites of a claim for injunctive relief, namely Torres's likelihood of success

on the merits. Torres's novel claim is at best frivolous." (footnote omitted)).

But, even applying the sliding scale analysis set out in *State of Texas v. Seatrain*

*International S/A*, 518 F.2d 175, 180 (5th Cir. 1975), the Court determines that, based

on Humana's failing to make the required showing of likely success on the merits and

irreparable injury, Humana's assertions and evidence as to the relative balance of the

threatened hardship faced by each of the parties and the public interest in keeping the

Manteca and Modesto hospitals in-network for the Medicare Advantage enrollees do

not justify the extraordinary and drastic remedy of a preliminary injunction. That is,

the Court determines that the extraordinary remedy of preliminary injunctive relief

should not issue after balancing the competing claims of injury and considering the

effect on each party of granting or withholding the requested relief, while paying particular regard for the public consequences. *See Winter*, 555 U.S. at 24.

### Conclusion

For the reasons explained above, Plaintiffs' Amended Motion for a Preliminary Injunction [Dkt. No. 14] is DENIED; Tenet's Motion to Strike [Dkt. No. 64] is terminated as moot; and the temporary restraining order, entered on October 4, 2016 and extended by subsequent orders, *see* Dkt. Nos. 18, 36, & 52, is dissolved.

DATED: November 21, 2016

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE